[Cite as *In re L.R.*, 2019-Ohio-1152.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: L.R.
  L.R.
  L.R.
  M.R.

C.A. Nos.  18CA011378
       18CA011385


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos. 17JC51903
      17JC51904
      17JC51905
      17JC51939

DECISION AND JOURNAL ENTRY

Dated: March 29, 2019

---

TEODOSIO, Presiding Judge.

{¶1} Appellants Mother and Father appeal the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that adjudicated their children neglected and/or dependent and placed them in the temporary custody of appellee Lorain County Children Services ("LCCS" or "the agency"). This Court affirms.

I.

{¶2} Mother and Father are the biological parents of 1-L.R. (d.o.b. 9/15/13), 2-L.R. (d.o.b. 10/18/14), 3-L.R. (d.o.b. 12/11/15), and M.R. (d.o.b. 6/12/17). The parents have never been married, and Father concedes in his brief that he has never sought a judicial determination of custody of the children. He, therefore, acknowledges that, pursuant to R.C. 3109.042(A), Mother has always been the sole residential parent and legal custodian of the children.

{¶3} Mother and Father have maintained a transient lifestyle and have had involvement with multiple public children services agencies. Based on concerns regarding domestic violence, instability in the home, Father's mental health and cognitive functioning, and Mother's failure to understand the risk Father posed to the then-born children, LCCS filed a complaint alleging that 1-L.R., 2-L.R., and 3-L.R. were neglected and dependent children. Four days later, after Mother gave birth to M.R., the agency filed another complaint alleging that M.R. was a dependent child. LCCS obtained an emergency order of temporary custody of all four children. The juvenile court appointed separate attorneys, as well as separate guardians ad litem, for both Mother and Father.

{¶4} After an adjudicatory hearing, the magistrate issued a decision finding that the three older children were neglected and dependent, and that M.R. was dependent. Mother and Father each filed timely objections, challenging venue and the adequacy of the evidence. LCCS responded in opposition.

{¶5} After a dispositional hearing, the magistrate issued a decision finding that it was in the best interest of the children that they be placed in the temporary custody of LCCS. Mother and Father each filed timely objections, challenging the adequacy of the evidence. LCCS responded in opposition.

{¶6} The juvenile court issued a judgment entry in February 2018, wherein it overruled Mother's and Father's objections, but failed to independently issue any orders. Mother and Father appealed, but this Court dismissed their appeals for lack of a final, appealable order. *In re L.R.*, 9th Dist. Lorain No. 18CA011299 (June 22, 2018), and *In re L.R.*, 9th Dist. Lorain No. 18CA011296 (June 26, 2018).

{¶7}    Subsequently, the juvenile court issued a judgment, overruling Mother's and Father's objections to the adjudicatory and dispositional decisions; finding 1-L.R., 2-L.R., and 3-L.R. neglected and dependent; finding M.R. dependent; and ordering the children into the temporary custody of LCCS.  Mother and Father filed separate timely appeals, in which they each raise three assignments of error for review.

II.

## MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT FAILED TO TRANSFER VENUE TO MAHONING COUNTY JUVENILE COURT WHERE LORAIN COUNTY HAS NO FACTUAL OR RESIDENTIAL CONNECTION TO THE PARTIES, AND SAID ERROR IS AN ABUSE OF DISCRETION.

## FATHER'S ASSIGNMENT OF ERROR I

[ ] THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPEL[L]ANT[']S REQUEST FOR A CHANGE OF VENUE FROM LORAIN COUNTY TO MAHONING COUNTY.

{¶8}    Mother and Father argue that the juvenile court erred by finding that Lorain County constituted a proper venue for the case.  This Court disagrees.

{¶9}    "Venue is a 'procedural matter,' and it refers not to the power to hear a case[, i.e., jurisdiction,] but to the geographic location where a given case should be heard." *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, ¶ 16, quoting *Morrison v. Steiner*, 32 Ohio St.2d 86, 87-88 (1972).  R.C. 2151.27 contains the venue provisions relevant in the juvenile law context.  *See In re Z.R.* at ¶ 17.  The statutory subsection applicable to this case states:

> [A]ny person having knowledge of a child who appears * * * to be an * * * abused, neglected, or dependent child may file a sworn complaint with respect to that child in the juvenile court of the county in which the child has a residence or legal settlement or in which the * * * abuse, neglect, or dependency allegedly occurred.

R.C. 2151.27(A)(1).  *See also* Juv.R. 10(A).

{¶10} Mother and Father have abandoned their arguments below seeking dismissal of the complaints on the basis of improper venue. Instead, they now maintain only that the juvenile court erred by failing to transfer the cases to Mahoning County Juvenile Court.

{¶11} Juv.R. 11 addresses the transfer of proceedings to another county and states, in relevant part:

> (A) Residence in Another County; Transfer Optional. If the child resides in a county of this state and the proceeding is commenced in a court of another county, that court, on its own motion or a motion of a party, may transfer the proceeding to the county of the child's residence upon the filing of the complaint or after the adjudicatory or dispositional hearing for such further proceedings as required. * * *
>
> * * *
>
> (C) Adjudicatory Hearing in County Where Complaint Filed. Where either the transferring or receiving court finds that the interests of justice and the convenience of the parties so require, the adjudicatory hearing shall be held in the county wherein the complaint was filed. Thereafter the proceeding may be transferred to the county of the child's residence for disposition.

{¶12} "[T]he decision to transfer venue is generally within the juvenile court's broad discretion." *In re Z.R.* at ¶ 25. To reverse on the basis of an abuse of discretion, this Court must conclude that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, we may not substitute our judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶13} For purposes of R.C. Chapter 2151, "a child has the same residence or legal settlement as his parents, legal guardian of his person, or his custodian who stands in the relation of loco parentis." R.C. 2151.06. Pursuant to R.C. 3109.042(A), "[a]n unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and

legal custodian." Later in his brief, Father asserts that "under Ohio law, Mother is the sole legal custodian and residential parent of these children[,]" as the parents have never been married and Father has never sought a court order designating him as a legal custodian of the children. Accordingly, the county in which Mother was residing at the time the complaints were filed constituted a proper venue for the proceedings.

{¶14} In this case, the evidence established that Mother was residing in Lorain County when LCCS filed its complaints. Mother, Father, and the three oldest children had been living with the paternal grandmother at her home in Youngstown, Mahoning County. After an incident of domestic violence between Mother and Father that occurred in that home at the end of March 2017, the then-pregnant Mother took her three children to the home of the maternal grandmother in Lorain, Lorain County. LCCS received a referral regarding the children. Upon investigation, the agency learned that Mother had filed a petition for a domestic violence civil protection order against Father, in which she listed herself and 1-L.R., 2-L.R., and 3-L.R. as protected parties, and in which she indicated that she was residing at an address in Lorain. Mother informed the LCCS caseworker that she intended to reside in Lorain with her mother until she could find independent housing in the same city. Mother told the caseworker that she did not plan to maintain any further relationship with Father.

{¶15} The paternal grandmother testified that Mother, along with the three children, moved out of her home in Mahoning County, in early April 2017. The caseworker verified that two of the children were with Mother in Lorain in mid-April. Although 3-L.R. was with Father in Mahoning County at that time, Mother told the caseworker that that was not a permanent arrangement. In fact, Mother and the maternal grandmother went to Father's residence in Mahoning County with a police escort to retrieve 3-L.R. As Mother's due date approached,

however, she left the children with Father while she stayed in Cleveland, Cuyahoga County, to be near the hospital where she planned to give birth. M.R. was born in a Cleveland-area hospital. Mother, however, had not established a residence in Cuyahoga County. In fact, all evidence indicated that Mother intended to reside in Lorain County from the time she left the home where she had been staying with Father in Mahoning County, in early April 2017, until LCCS filed its complaints regarding 1-L.R., 2-L.R., and 3-L.R. on June 8, 2017, and regarding M.R. on June 12, 2017.

{¶16} As Mother was the sole legal custodian of the children, and as she resided in Lorain County when LCCS filed its complaints, Lorain County Juvenile Court constituted a proper venue for the proceedings below, pursuant to R.C. 2151.27(A)(1) and Juv.R. 10(A). Accordingly, the juvenile court was not unreasonable in denying any request to transfer the proceedings to Mahoning County. Mother's and Father's first assignments of error are overruled.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THE MINOR CHILDREN, 1-L.R. (DOB 09/15/13), 2-L.R. (DOB 10/18/14), 3[-]L.R. (DOB 12/11/15) TO BE NEGLECTED AND DEPENDENT; AND [ ] M.R. (DOB 06/12/17) TO BE A DEPENDENT CHILD, AS TH[OSE] FINDING[S ARE] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### FATHER'S ASSIGNMENT OF ERROR II

[ ] THE TRIAL COURT ERRED IN ADJUDICATING THE MINOR CHILDREN 1-L.R. (DOB 09/15/13), 2-L.R. (DOB 10/18/14), 3-L.R. (DOB 12/11/15) TO BE NEGLECTED AND DEPENDENT; AND [ ] M.R. (DOB 06/12/17) TO BE A DEPENDENT CHILD, ALL AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND AN ABUSE OF DISCRETION[.]

{¶17} Mother and Father argue that the juvenile court's adjudicatory orders regarding the children are against the manifest weight of the evidence. This Court disagrees.

{¶18} Juvenile abuse, neglect, and dependency cases are initiated by the filing of a complaint by any person with the requisite knowledge. *See* Juv.R. 22(A); Juv.R. 10; R.C. 2151.27(A). The complaint is "the legal document that sets forth the allegations that form the basis for juvenile court jurisdiction." Juv.R. 2(F). The juvenile court must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint. *See In re Hunt*, 46 Ohio St.2d 378, 380 (1976). If allegations in the complaint are not proved by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint. Juv.R. 29(F)(1); R.C. 2151.35(A)(1). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶19} This Court reviews as follows:

> In determining whether the juvenile court's adjudication of dependency is against the manifest weight of the evidence, this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]

(Modifications in the original and internal quotations omitted.) *In re R.L.*, 9th Dist. Summit No. 28387, 2017-Ohio-4271, ¶ 8, quoting *In re C.S.*, 9th Dist. Summit No. 26178, 2012-Ohio-2884, ¶ 5, quoting *In re A.W.*, 195 Ohio App.3d 379, 2011-Ohio-4490, ¶ 8 (9th Dist.).

{¶20} Mother and Father challenge the findings that 1-L.R., 2-L.R., and 3-L.R. are neglected children pursuant to R.C. 2151.03(A)(2) and/or (3), and that all four children are dependent pursuant to R.C. 2151.04(B) and/or (C).

Neglect

{¶21} R.C. 2151.03(A) defines a "neglected child", in relevant part, as one:

(2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian; [or]

(3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being[.]

{¶22} LCCS received a referral regarding the well-being of the three older children after Mother had relocated to Lorain after a domestic violence incident between Mother and Father in Youngstown. Officer Tackett of the Youngstown Police Department testified that he had been dispatched to the home where Mother and Father were residing between five and ten times over a two-year period regarding fights among residents. When the officer investigated a call on March 31, 2017, he could see through a window that Mother and Father were tussling. Mother screamed that Father would not let her leave the house. Once the officer was able to diffuse the situation, he saw physical injuries on both parents. The three children, who were in the area where Mother and Father had been fighting, looked scared and were crying.

{¶23} The LCCS direct services caseworker testified that both Mother and Father admitted to having a long history of domestic violence with each other. Mother obtained a protection order for herself and the children against Father based on the danger she believed he posed. Nevertheless, Mother disregarded that risk on multiple occasions by leaving one or more of the children with Father.

{¶24} The caseworker expressed concerns regarding Father's mental health. Father would make grandiose statements and claim to be someone that he was not. Father also admitted having anger management issues and blacking out when enraged. After Mahoning County Children Services ("MCCS") conducted a courtesy welfare check at the Youngstown home at the request of LCCS, Father called MCCS threatening to "blow the place up." When questioned by

a sheriff's department detective, Father explained that he thought he had called LCCS, and that he had no animosity towards MCCS.

{¶25} The paternal grandmother also testified regarding the violence to which the children were exposed, describing her home as a "battle ground" when Mother and Father were there. She further described multiple incidents where she observed Father physically harming the children. One time when Father's ride failed to pick him up, he became irate and took his anger out on the two-year old 2-L.R., "assaulting the child." On another occasion when the child was not eating her dinner, Father held the child up and screamed at her. Father's aunt also testified about occasions when Father would spank one of the children because he was angry about something unrelated to the children.

{¶26} Both the paternal grandmother and paternal great aunt expressed concerns that Mother did not understand the risk that Father posed to the children. Moreover, the paternal great aunt, who had decades of experience caring for children as a daycare provider, teacher, and current foster care aide, testified that Mother and Father had no understanding of child development and would often fail to get up to feed the children and change their diapers. In addition, when the oldest child was with Father, he declined to continue to send her to school after LCCS sent the police to remove the child from her school bus at a time when she was subject to a protection order against Father.

{¶27} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in adjudicating 1-L.R., 2-L.R., and 3-L.R. neglected children. The clear and convincing evidence supports the finding that the children lacked adequate care because of the faults or habits of Mother and Father. The parents habitually engaged in incidents of domestic violence, often in the presence

of the children, leaving the children visibly frightened and shaken. Father engaged in harsh and physically aggressive discipline of the young children, often simply because he was angry about an unrelated matter. Although Mother relocated with the children to Lorain and obtained a domestic violence civil protection order, she nevertheless continued to allow Father to care for the children. Despite her knowledge of the risk Father posed to the children, Mother minimized the concerns of family and caseworkers.

{¶28} Moreover, the clear and convincing evidence supports the finding that the parents refused to provide proper or necessary subsistence or other care necessary for the children's health and well-being. Mother would stay in bed and fail to feed the children breakfast or change their saturated diapers. The paternal great aunt often had to step in to provide such essential care for the children. Based on the above evidence, the juvenile court's adjudication of 1-L.R., 2-L.R., and 3-L.R. as neglected children was not against the manifest weight of the evidence.

Dependency

{¶29} R.C. 2151.04(B) defines a "dependent child" as one "[w]ho lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian[.]" Pursuant to R.C. 2151.04(C), a "dependent child" is one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]"

{¶30} In addition to the evidence cited above, the MCCS intake caseworker echoed the concerns of law enforcement, family members, and the LCCS direct services caseworker. Although MCCS declined to file a complaint in the Mahoning County Juvenile Court, it did so because Mother had obtained a protection order and Father was supposed to be out of the home.

The MCCS intake worker elaborated, however, on concerns regarding the transiency of the parents. Mother and Father traveled to Columbus, Athens, Pittsburgh, Cincinnati, Chicago, Youngstown, and Lorain, often living in homeless shelters with the children. Mother told the caseworker that she did not see transiency and living in shelters as a problem. Father testified that the family moved frequently from county to county, and even out of state, for the express purpose of evading child welfare agencies. When given the opportunity to participate in voluntary services with MCCS, Mother declined. Accordingly, when with Mother and Father, the children were living in an environment where their parents had no stable housing, were unemployed with no income, were constantly fighting, and where Mother declined to take advantage of means (services and protection orders) to protect herself and the children.

{¶31} Furthermore, Mother repeatedly minimized the risks Father's behavior presented to the family, as well as the threat he made to blow up LCCS. In fact, Mother told the caseworker that Father had gone to jail for making similar threats to Franklin County Children Services ("FCCS") for its investigation into concerns when the family lived in Columbus. In the four days between the issuance of the emergency orders of temporary custody for the three oldest children and the emergency order regarding M.R., Father was arrested and placed in jail for threatening to bring a pistol to the LCCS facility.

{¶32} Although M.R. was taken into agency care directly from the hospital after his birth and did not live with Mother and Father, the LCCS caseworker testified that Mother's lack of understanding of the risks posed by Father had not changed. Mother vacillated in the same conversation with the caseworker between expressing concern for the danger Father posed and a lack of fear for the man whose "ass" she would "beat." Moreover, although Mother indicated

that she had no plans to continue a relationship with Father, Father told the caseworker that the parents were planning to find a home together.

{¶33} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in adjudicating 1-L.R., 2-L.R., 3-L.R., and M.R. dependent children. Mother and Father presented physical and psychological risks to the children who were exposed to a violent home environment. The three oldest children lacked stability due to the parents' decision to relocate frequently, mainly for the purpose of evading child welfare agencies whose purpose is to protect children. Even after leaving Father, obtaining a domestic violence civil protection order, and using a police escort to retrieve one of the children, Mother continued to allow the children to return on various occasions to Father's care. When questioned about her judgment, Mother minimized Father's violent behavior. Under these circumstances, the evidence supported the juvenile court's findings that the children lacked adequate parental care by reason of the mental or physical condition of the parents. In addition, the evidence supported the finding that the children's conditions warranted the state in assuming the children's guardianships in their interests. Accordingly, the adjudication of 1-L.R., 2-L.R., 3-L.R., and M.R. as dependent children was not against the manifest weight of the evidence. Mother's and Father's second assignments of error are overruled.

## MOTHER'S ASSIGNMENT OF ERROR III

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED TEMPORARY CUSTODY OF [THE CHILDREN] TO LORAIN COUNTY CHILDREN'S SERVICES, AS THAT ORDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**FATHER'S ASSIGNMENT OF ERROR III**

[ ] THE TRIAL COURT ERRED IN ORDERING A DISPOSITION OF THE MINOR CHILDREN [ ] TO THE TEMPORARY CUSTODY OF LORAIN COUNTY CHILDREN SERVICES, AS SUCH AN ORDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND AN ABUSE OF DISCRETION.

**{¶34}** Mother and Father argue that the juvenile court's order of temporary custody of the children to LCCS is against the manifest weight of the evidence. This Court disagrees.

**{¶35}** After a child is adjudicated abused, neglected, or dependent, the juvenile court may issue one of the various possible dispositional orders, including committing the child to the temporary custody of a public children services agency. R.C. 2151.353(A)(2)(a). *See also* Juv.R. 34(D)(2). Neither the statute nor the rule enunciates a test for determining when it is appropriate to place a child in the temporary custody of any person or the agency. Nevertheless, it has long been the precedent in Ohio that the overriding consideration in child custody matters is the best interest of the child. *See, e.g., Clark v. Bayer*, 32 Ohio St. 299, 310 (1877) ("[I]n all cases of controverted right to custody, the welfare of the minor is first to be considered."). The legislature has also mandated the liberal interpretation and construction of R.C. Chapter 2151 to "*provide for the care, protection, and mental and physical development of children * * *,* whenever possible, in a family environment, separating the child from the child's parents only when *necessary for the child's welfare* or in the interests of public safety[.]" (Emphasis added.) R.C. 2151.01(A). Accordingly, this Court reviews to determine whether the juvenile court's finding that the best interest of the children warranted their placement in the temporary custody of LCCS was against the manifest weight of the evidence.

**{¶36}** The manifest weight standard of review is set out above. In regard to best interest pursuant to R.C. Chapter 2151, the statutory scheme is devoid of specific considerations outside

the context of an award of permanent custody. However, as Ohio courts are guided by the best interest factors in R.C. 2151.414(D) (relating to permanent custody) and in R.C. 3109.04(F)(1) (relating to the allocation of parental rights and responsibilities) in legal custody cases, it is reasonable to seek guidance from those same factors regarding an award of temporary custody. The R.C. 2151.414(D)(1)(a)-(e) factors include the interaction and interrelationships of the children, the children's wishes, the custodial history of the children, the children's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. The R.C. 3109.04(F)(1) factors overlap the above factors, but further include the children's adjustment to their environments; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio.

{¶37} Both Mother and Father argue that the evidence demonstrated that it was in the best interest of the children that they be placed in the temporary custody of Mother, rather than LCCS. Based on a review of the evidence, the award of temporary custody of the children to the agency was not against the manifest weight of the evidence.

{¶38} Father was incarcerated throughout the course of the proceedings based on his threats to bring a pistol to the agency facility. During the hour and twenty minutes that the children's guardian ad litem met with Father in jail, Father never once inquired about the children. Instead, Father spoke only about himself, mainly ranting about the mistreatment he had suffered from the multiple child welfare agencies involved with the family throughout the lives of these young children. The current LCCS caseworker visits Father in jail once a month.

Father told him that, upon release from jail, he plans to relocate to Chicago or Columbus, although he might eventually return to Youngstown.

{¶39} Throughout the case, Mother has lived part of the time in Lorain with her mother, and part of the time in Georgia with her godmother and in a domestic violence shelter. Mother was directed to leave the shelter after she repeatedly failed to attend mental health appointments and broke facility rules. Thereafter, Mother returned to her mother's home in Lorain. While in Georgia, however, Mother contacted LCCS demanding that the agency send the children to her. When the agency explained why that was not possible, Mother became angry and yelled at the caseworker.

{¶40} Both the guardian ad litem and the caseworker expressed concerns regarding Mother's living arrangements in the maternal grandmother's home. There were six people living in the three-bedroom home that had only one bed upstairs and one cot in the unfinished basement. Although the maternal grandmother testified that she would try to acquire beds and bedding for the four children, she stated that her sole source of income from social security disability had just been reduced to $849.00 per month and that she had many bills to pay.

{¶41} Father expressed reservations about the children living in the maternal grandmother's home. He told the caseworker that the children would not be safe there based on the men who are in and out of the home, as well as the grandmother's failure to keep Mother safe in a similar environment as a child. The maternal grandmother admitted that she had lost custody of Mother when Mother was 14 years old. In addition, she admitted that she is bipolar and is not currently in treatment or taking any medication to address her mental health issue.

{¶42} Mother had not demonstrated any ability to parent the children safely and appropriately at the time of the dispositional hearing. She failed to appear for seven of her 16

scheduled visits with the children. Based on observations by the guardian ad litem and the caseworker, Mother spent the first 10-15 minutes of each hour-long visit ranting about trivial matters, like the decorations on M.R.'s car seat or the lack of braids in the girls' hair, rather than interacting with the children. Mother was not able to manage the four children simultaneously, leaving the three girls to tend to themselves while Mother fed M.R. and barked orders for people to bring her things. Both the guardian ad litem and the caseworker expressed concerns regarding Mother's lack of engagement with the children. Instead of playing with and nurturing the children, she was focused on undressing the children to look for signs of physical abuse or neglect. The caseworker testified that Mother's behavior caused the children visible stress.

{¶43} Mother was initially unprepared to meet the basic needs of the children during visitation. She bristled at the caseworker's directive that she bring diapers, wipes, bottles, and anything else she wanted the children to have during visitations. Mother asserted that it was the agency's or foster parents' duty to provide for all of the children's needs, and that Mother's assets belonged solely to her for her use and enjoyment. She further expressed anger when the Child Support Enforcement Agency contacted her regarding child support. Mother believed she had no financial obligation to help provide for her children when they were not in her physical custody, despite the caseworker's explanation that child support orders are routine in these cases, so that parents can demonstrate their ability to meet the children's basic needs.

{¶44} Mother told the guardian ad litem that she had obtained employment restocking goods but that she had not been able to attend the training or start working because she had no transportation. The caseworker testified, however, that a woman called him and said that she had offered Mother employment, as well as transportation to training and all work sites. Accordingly, although Mother could have been earning an income to show her ability to meet the

basic needs of the children, Mother had not taken advantage of that situation. Mother sought services through Human Services, but she was asked to leave the office after becoming aggressively loud upon learning that she had to either engage in training or education in order to qualify for food stamps.

{¶45} Both the guardian ad litem and the caseworker testified that they had concerns about Mother's mental health, based both on conversations with her and her interactions with the children. Mother expressed a lack of understanding as to what she needed to do to keep her children safe and provide for their needs. When asked what she would now do differently to address Father's violent behaviors towards her and the children, Mother stated that she would ask Father to reiterate his prior promises to change his behavior ten or eleven times, if necessary. As to her lack of engagement with the children and her orders to them during visits to get things and do things for her, Mother told the caseworker that the reason she had so many children was so they could help her.

{¶46} During visits with Mother, the children remained quiet and did not smile. The LCCS direct services supervisor testified that she saw no evidence of any bond or attachment between Mother and the children during visits. Although they would hug and kiss Mother when she told them to do so, the children did not initiate any affection towards Mother. Often, the children merely sat quietly or played with one another, as Mother ranted about agency interference and shortcomings and failed to interact with the children. In the foster homes, however, the guardian ad litem and the caseworker witnessed the children to be talkative, smiling, laughing, and very engaging. 1-L.R. is in trauma therapy to address issues due to instability and exposure to domestic violence. All the children are healthy, safe, and comfortable in their foster homes.

{¶47} The agency direct services supervisor initiated background checks and inquiries into potential relative placements. The maternal grandmother was excluded from consideration based on her prior involvement with LCCS for substantiated concerns and her criminal history of violent offenses. A maternal cousin who expressed an interest in receiving placement of the children withdrew herself from consideration based on her fear of Father. No other viable relative placements existed at the time of the dispositional hearing.

{¶48} The children have spent most or all of their short lives out of Mother's and Father's custody. 1-L.R. spent two years in the temporary custody of FCCS. 2-L.R. was removed by FCCS shortly after her birth. FCCS sought emergency temporary custody of 3-L.R. after her birth, but Mother and Father staved off removal by moving from county to county and state to state. When the three older children were with Mother and Father, they were exposed to a transient lifestyle, often staying in homeless shelters. M.R. never lived with Mother and Father, as LCCS obtained emergency temporary custody when the child was still in the hospital after his birth.

{¶49} Based on a review of the record, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice when it placed the four children in the temporary custody of LCCS. Neither Mother nor Father was capable of providing a safe and stable home for the children. Father was incarcerated. Mother was living in an already crowded environment that was not physically appropriate for the children. In addition, the maternal grandmother's prior involvement with LCCS, violent criminal history, and untreated mental health issues posed a risk to the children. Mother was not employed and expressed an aversion to using any money she acquired for the needs of the children. Mother exhibited self-interest above any interest in the welfare of the children. She failed to engage with

or nurture the children during the limited visitations she exercised. The children displayed no attachment to Mother or any enjoyment during visits. On the other hand, all of the children were thriving in foster care. No viable relative placements existed. The guardian ad litem opined that an award of temporary custody to LCCS was in the children's best interest. Under the circumstances, the juvenile court's placement of 1-L.R., 2-L.R., 3-L.R., and M.R. in the temporary custody of LCCS was not against the manifest weight of the evidence. Mother's and Father's third assignments of error are overruled.

III.

{¶50} Mother's and Father's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

BRANDON G. OLIVER, Attorney at Law, for Appellant.

LORIE BROBST, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and EMILY KIRSCH, Assistant Prosecuting Attorney, for Appellee.

CLAUDE THOMPSON, Guardian ad Litem.

MICHAEL TOWNE, Guardian ad Litem for Mother.

JAMES BARILLA, Guardian ad Litem for Father.