**[Cite as *In re L.O.-D.*, 2026-Ohio-1745.]**

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: L. O.-D.

C.A. No.     31641

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 25 01 0046

DECISION AND JOURNAL ENTRY

Dated: May 13, 2026

FLAGG LANZINGER, Judge.

{¶1}     Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated her child dependent and placed the child in the temporary custody of Summit County Children Services Board ("CSB" or "the agency").  This Court affirms.

I.

{¶2}     Mother is the biological mother of L.O.-D., born February 7, 2014.  The child's father is not involved in her life and has not appealed.

{¶3}     At the end of 2023, CSB investigated reported concerns that Mother was struggling to handle daily activities, including ensuring that the child was attending school.  The agency developed a voluntary service plan but, when Mother declined to participate, CSB closed the case after five months.

{¶4}     Four months later, the agency received a report that Mother was being subjected to domestic violence, exhibiting paranoid and illogical behaviors, and failing to participate in a

truancy diversion plan developed by the child's school to address her excessive absences. After investigation, CSB also discovered that Mother and the child were facing eviction from their subsidized housing due to multiple failed home inspections. In addition, the agency learned that the principal at the child's school had banned Mother from school property based on her behavior on site after a disagreement with staff. CSB was able to access Mother's 2023 mental health evaluation from Portage Path that rendered diagnoses of bipolar disorder and post traumatic stress disorder. Mother was no longer in counseling to address those issues, however.

{¶5} In October 2024, CSB filed a complaint alleging that L.O.-D. was a neglected and dependent child. The agency initially left the child in Mother's legal custody under its protective supervision. After two months, however, CSB removed the child because (1) Mother had not sought joint counseling to address the trauma she and L.O.-D. experienced due to a history of exposure to intimate partner violence against Mother in the home; (2) the friend's home where Mother and the child moved after eviction was extremely cluttered, with items piled throughout the home, including on the child's bed; (3) Mother had not reengaged in mental health services; and (4) L.O.-D. continued to miss school on a regular basis. The agency placed the child in the home of the maternal grandmother ("Grandmother"). Thereafter, Mother repeatedly went to Grandmother's home unannounced, once in the middle of the night, banging on doors, shouting, and refusing to leave.

{¶6} CSB dismissed its October 2024 complaint due to statutory time constraints but immediately refiled the complaint on January 30, 2025. Evidence at the shelter care hearing demonstrated that Mother continued to appear at Grandmother's home unannounced, that Mother and Grandmother had a tense relationship, and that Mother and the friend ("Mr. G."), in whose home she lived, behaved and commented inappropriately during visits with the child. The juvenile

court issued a no contact order between Mother and Grandmother except as necessary to facilitate visitation.

{¶7}  After a contested adjudicatory hearing, the magistrate found that L.O.-D. was a dependent child but not neglected.  Following the dispositional hearing, the magistrate placed the child in CSB's temporary custody and adopted the agency's case plan as an order.  Mother filed objections to both the adjudicatory and dispositional decisions.  CSB replied in opposition.

{¶8}  The juvenile court overruled Mother's objections and adjudicated L.O.-D. dependent.  The trial court premised its finding on multiple instances of Mother's erratic and aggressive behaviors, hoarding leading to failed housing inspections and ultimately eviction, extreme clutter in the home Mother shared with the child and Mr. G., unaddressed trauma arising from Mother's and the child's histories of exposure to domestic violence, and the child's habitual truancy over five years despite repeated interventions by schools and the agency.  The juvenile court further found it was in the child's best interest to place her in CSB's temporary custody.  The trial court based its disposition on evidence of pervasive clutter in Mother's current home, Mother's long history of failing to send the child to school, her failure to engage in mental health services despite established diagnoses, and a recent positive drug screen showing Mother's use of methamphetamine.  Mother timely appealed, raising one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE FINDING OF DEPENDENCY AND GRANTING OF TEMPORARY
CUSTODY TO [CSB] WAS AGAINST THE MANIFEST WEIGHT OF THE
EVIDENCE.

{¶9}     Mother argues that the juvenile court's judgments adjudicating L.O.-D. a dependent child and placing her in the temporary custody of CSB is against the manifest weight of the evidence. This Court disagrees.

Adjudication

{¶10}   A child welfare agency initiates a juvenile dependency, neglect, and/or abuse case by filing a complaint in the juvenile court. *See* Juv.R. 22(A); Juv.R. 10; R.C. 2151.27(A). The complaint is "the legal document that sets forth the allegations that form the basis for juvenile court jurisdiction." Juv.R. 2(H). The juvenile court must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint. *See In re Hunt*, 46 Ohio St.2d 378, 380 (1976). If the agency fails to prove the allegations in the complaint by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint. Juv.R. 29(F)(1); R.C. 2151.35(A)(1). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶11}   This Court reviews a manifest weight challenge to an adjudicatory finding as follows:

> In determining whether the juvenile court's adjudication of dependency is against the manifest weight of the evidence, this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]

(Alterations sic.) *In re R.L.*, 2017-Ohio-4271, ¶ 8 (9th Dist.), quoting *In re C.S.*, 2012-Ohio-2884, ¶ 5 (9th Dist.), quoting *In re A.W.*, 2011-Ohio-4490, ¶ 8 (9th Dist.).

{¶12} Mother challenges the finding that L.O.-D. is dependent pursuant to R.C. 2151.04(C), which defines a "dependent child" as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" This Court recognizes that

> [a] dependency finding under R.C. 2151.04(C) does not require specific parental fault; rather the focus is on the child's situation to determine whether the child is without proper or adequate care or support. The conduct of the parent is relevant only insofar as it forms a part of the child[ ]'s environment and it is significant only if it has a detrimental impact on her.

(Internal citations and quotations omitted.) *In re A.S.,* 2020-Ohio-1356, ¶ 10 (9th Dist.), quoting *In re I.T.*, 2016-Ohio-555, ¶ 32 (9th Dist.).

{¶13} In its refiled complaint, CSB alleged that Mother's untreated mental health diagnoses, including bipolar disorder and post traumatic stress disorder, were impacting her daily activities and interfering with her ability to provide an appropriate environment for the child. Specifically, the agency alleged that Mother had not shielded the child from exposure to violence in the home against Mother by a paramour, maintained the home in a state of clutter so severe that it led to eviction from subsidized housing, and failed over a period of years to ensure that the child attended school on a regular basis. CSB further received a report that Mother was abusing methamphetamine and that her then-boyfriend was arrested in possession of that drug.

{¶14} This Court recognizes the role that truancy plays in determining whether a child is dependent. Evidence of chronic truancy, with nothing more, is insufficient to establish a child's dependency. *In re M.O.*, 2010-Ohio-5107, ¶ 14-16 (9th Dist.); *see also In re E.P.*, 2023-Ohio-2432, ¶ 13 (9th Dist.). While the juvenile court may consider poor school attendance as one of the underlying facts, there must be evidence of other concerns in the home beyond school absences to support a dependency adjudication. *In re M.O.* at ¶ 16 (9th Dist.). Examples of such concerns

include the lack of basic necessities like food or shelter, deplorable living conditions like filth or an unsafe physical environment, domestic violence, and the child's exposure to drugs or drug abuse by a resident in the home. *Id.* In this case, concerns beyond chronic truancy exist to support the juvenile court's adjudication of L.O.-D. as a dependent child.

{¶15} At the adjudicatory hearing, CSB presented the testimony of three agency caseworkers, and the principal and her secretary from the child's elementary school. The family first came to the agency's attention after a report that L.O.-D. had 18 full absences and five partial absences by September 20 of the 2024-2025 school year. The report also raised concerns about Mother's emotional stability and her possible eviction.

{¶16} The initial caseworker assigned to investigate tried to reach Mother on multiple occasions at home and by phone over the course of eleven days but was unsuccessful. Mother finally called back and discussed the reported concerns with the caseworker. She said that the child had missed school based on medical issues and that the school was not supporting the family. Mother also admitted that she was struggling with depression and anxiety.

{¶17} Mother agreed to a home visit, but she failed to contact the caseworker with her schedule, as promised. The caseworker texted Mother dates for two visits, but Mother canceled both. Three weeks after the agency's initial attempt to reach Mother, an intake caseworker was able to conduct a home visit. The intake worker described the home as "highly cluttered[,]" rising to a "hoarding situation." Boxes were piled throughout the home rising halfway to the ceiling, although there were pathways in most rooms. The intake worker testified that the child's room was the least cluttered and that L.O.-D. had access to her bed.

{¶18} During the home visit, Mother explained that the child's absences from school were due to illness, but that school staff did not believe her because they were "out to get her[.]" The

intake worker testified that she asked L.O.-D. why she was missing school. The child reported loving school, that she was not sure why she was not attending, and that she could not identify any recent illnesses that prevented her from going to school. When the intake worker asked Mother to call the school in her presence to reschedule a truancy meeting to get the child back on track with her education, Mother refused but would not explain why.

{¶19} Finally, the intake worker testified that Mother reported that L.O.-D. had been exposed to domestic violence against Mother by a paramour. Mother informed the worker that she was open to counseling for herself and the child to address their exposure to violence but that she had not pursued those services. The currently assigned caseworker also testified that Mother reported that she and the child lived during the past year in an environment of violence perpetrated by Mother's then-boyfriend. Mother reported to this caseworker too that she agreed that she and the child needed counseling to process their trauma. When the current caseworker tried to implement such services, however, Mother recanted her allegations but then complained that no one would help her.

{¶20} The initial caseworker testified as to the ongoing concerns in the child's environment before the case transferred to the current caseworker. She reported that truancy issues continued despite the intervention of both CSB and the child's school to implement attendance improvement plans. The school principal testified that she scheduled multiple attendance intervention plan meetings during the two years L.O.-D. was enrolled. A care team comprised of the principal, a social worker, a counselor, the child's teacher, and the school psychologist tried to meet with Mother to develop a plan to address the barriers to the child's ability to attend school. Despite notice, Mother rarely attended the care team meetings. Nevertheless, the school

coordinated with the family's home district (Akron Public Schools) to provide transportation for the child to attend Cuyahoga Falls City Schools through open enrollment.

{¶21} The juvenile court admitted the child's school records from both Akron Public Schools and the Cuyahoga Falls City School District. Those records indicated that L.O.-D. had missed an excessive amount of school over the past few years due to absences and tardies. For example, the child was absent or tardy 112 times during the 2022-2023 school year. In the four months during the 2024-2025 school year before CSB removed the child from Mother's home after holding protective supervision, L.O.-D. had 29 full absences, 13 partial absences, and was tardy seven times. The various schools sent Mother a dozen notices of excessive or habitual truancy and made multiple referrals for truancy proceedings. These measures, in addition to multiple attempts to work with Mother and other interventions by the schools to address the barriers interfering with the child's ability to attend school, failed to remediate the child's truancy. L.O.-D.'s principal testified that Mother was either nonresponsive or hostile to her efforts to help.

{¶22} Both the school principal and her secretary testified that Mother's responses to any inquiry about the child's late appearances or absences immediately "escalated" to aggression. The current caseworker echoed that testimony. Both the principal and current caseworker testified that they asked Mother to sign a release of information giving the school and agency access to the child's medical records so they could review them and develop a plan including relevant accommodations to meet the child's medical needs and facilitate school attendance. In both instances, Mother refused, yelling and slamming her door in the caseworker's face.

{¶23} The school principal and her secretary both testified regarding an incident when Mother pounded on the school door, yelled at staff, and left multiple voicemail messages after the school enforced its policy prohibiting the child from attending a dance because she had been absent

from school that day. After that incident, the principal sent Mother a letter notifying her that, based on school policy, she was now banned from school property for the remainder of the school year unless she gave notice and police were present.

{¶24} In addition to Mother's reactions to inquiries about the child's school attendance, the current caseworker testified that Mother exhibited concerning behaviors in other situations, as well. For example, Mother would schedule, cancel, reschedule, and cancel meetings repeatedly. She refused the caseworker's offers of help, including food gift cards, unloading Mother's belongings from a truck as she moved into her friend's home, and facilitating joint counseling services for Mother and the child. Then Mother would either complain that no one would help her or deny that she had ever indicated the need for certain assistance.

{¶25} The juvenile court admitted Mother's records from Portage Path Behavioral Health. Those records indicated that Mother was diagnosed with bipolar disorder, she had a history of severe trauma, and she exhibited paranoia which could be extreme at times. The caseworker expressed concern that some of Mother's excuses for the child's truancy indicated the paranoia previously recognized by a mental health professional. In her own testimony at the adjudicatory hearing, Mother asserted that the school secretary had been trying to provoke her for two years. She further conceded, "I don't trust people." Although Mother testified that she believed she was taking care of her mental health, she admitted that she has not always recognized when she needed help.

{¶26} While the initial complaint was pending, and mere days after the current caseworker assumed the case, Mother was evicted. The caseworker testified that Mother had repeatedly failed her subsidized housing inspections due to the extremely cluttered conditions in the home, and that Mother had exhausted all her opportunities to remedy the situation. While her personal belongings

were strewn across the lawn, Mother told the caseworker that she did not know where she and the child could go to live, and she was angry that CSB had not prevented her eviction.

{¶27} Weeks after moving into her friend's home, Mother eventually let the caseworker enter to assess the home. L.O.-D. was still in Mother's legal custody under the agency's protective supervision at that point. The caseworker testified that this home too was very cluttered. Unlike the previous home where the child could still access her bed, in this home, the child's bed was mounded with various items, leaving only a small area for her to sleep.

{¶28} While the initial complaint was still pending and L.O-.D. had been under the agency's protective supervision for three months, CSB removed the child from Mother's home and obtained an emergency order of temporary custody. The caseworker testified that, while the child had not suffered any specific harmful incident in Mother's care, there had been no improvement in the child's home conditions either. The child continued to be truant from school, Mother continued to reject help from the agency and the child's school, the home conditions became even more cluttered and indefinite, and Mother canceled agency team decision meetings where all parties might have worked together to develop a plan to address ongoing issues. Moreover, there was a concern for the child's safety, given Mother's behaviors and the principal's reports that the child appeared exhausted at school when she did attend.

{¶29} Despite the allegation that Mother may have been using methamphetamine, CSB presented no evidence at the adjudicatory hearing to support that. Moreover, there was no evidence that she was still in any way involved with her prior boyfriend who may have possessed illegal drugs in Mother's home.

{¶30} Based on a thorough review of the evidence, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by

adjudicating L.O.-D. a dependent child. Unaddressed issues in the child's home environment have impacted her well-being and development for a number years. L.O.-D. has missed substantial amounts of school for reasons that Mother was unable to substantiate, while remaining resistant to the interventions of multiple school staff and agency caseworkers. The child's principal banned Mother from school grounds based on her behaviors.

{¶31} Moreover, the child was exposed to domestic violence against Mother by a boyfriend. Although Mother admitted that both she and the child should engage in counseling to address the trauma associated with violence in their home, Mother did not pursue that and rebuked the CSB caseworker for offering to make a referral for services. Finally, Mother maintained a home in such an extreme state of clutter that she was evicted from her subsidized housing after failing multiple inspections. While Mother was able to find shelter for herself and the child in Mr. G.'s home, the clutter in that home was even worse, leaving only a small area of the child's bed open for her to sleep. Under these circumstances, clear and convincing evidence regarding L.O.-D.'s environment warranted the state, in the child's interests, in assuming her guardianship. Accordingly, the juvenile court's finding that L.O.-D. was a dependent child under R.C. 2151.04(C) is not against the manifest weight of the evidence.

Disposition

{¶32} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.)

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶33} Once the juvenile court has adjudicated a child dependent, neglected, or abused, it may issue any of the various possible dispositional orders enumerated in R.C. 2151.353(A), including committing the child to the temporary custody of a public children services agency. R.C. 2151.353(A)(2)(a). *See also* Juv.R. 34(D)(2). Although the statute and rule provide no test for determining the need to commit a child in the agency's temporary custody, this Court has recognized the following:

> it has long been the precedent in Ohio that the overriding consideration in child custody matters is the best interest of the child. *See, e.g., Clark v. Bayer*, 32 Ohio St. 299, 310 (1877) ("[I]n all cases of controverted right to custody, the welfare of the minor is first to be considered."). The legislature has also mandated the liberal interpretation and construction of R.C. Chapter 2151 to "*provide for the care, protection, and mental and physical development of children * * *,* whenever possible, in a family environment, separating the child from the child's parents only when *necessary for the child's welfare* or in the interests of public safety[.]" (Emphasis added.) R.C. 2151.01(A).

*In re L.R.*, 2019-Ohio-1152, ¶ 35 (9th Dist.). Accordingly, we review to determine whether the award of temporary custody to CSB premised on the best interest of the child was against the manifest weight of the evidence.

{¶34} The statutory scheme in R.C. Chapter 2151 contains no specific best interest considerations outside the context of permanent custody determinations. "However, as Ohio courts are guided by the best interest factors in R.C. 2151.414(D) (relating to permanent custody) and in R.C. 3109.04(F)(1) (relating to the allocation of parental rights and responsibilities) in legal custody cases, it is reasonable to seek guidance from those same factors regarding an award of temporary custody." *In re L.R.* at ¶ 36 (9th Dist.). The best interest factors in R.C. 2151.414(D)(1)(a)-(e) include the interaction and interrelationships of the child, the child's wishes,

the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. The best interest factors in R.C. 3109.04(F)(1) overlap the above factors to a great extent, but further include the child's adjustment to her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio.

{¶35} L.O.-D. was ten years old at the time of her removal. She had spent her entire life in Mother's legal custody.

{¶36} At the dispositional hearing, the CSB caseworker testified that if L.O.-D. were to be returned to Mother's care at this time, they would be living in the home of Mother's friend, Mr. G. Mother admitted that she was not currently looking for independent housing and planned to stay with Mr. G. indefinitely. The caseworker was concerned about the physical state of Mr. G.'s home because of substantial clutter throughout the home that even impacted the child's ability to sleep in her bed. In addition, the caseworker had concerns about Mr. G.'s behavior and attitude. She testified that Mr. G. was very defensive of Mother, resulting in his verbal aggression towards agency personnel and the guardian ad litem. Moreover, he minimized Mother's concerning behaviors and the child's school truancy, thereby indicating he would not support efforts to remedy the agency's concerns.

{¶37} The guardian ad litem echoed the caseworker's concerns regarding Mother's introduction of Mr. G. into the circumstances. She testified that every meeting and conversation devolved into unproductive encounters as Mr. G. used inflammatory language that fueled Mother's defensiveness and aggression toward her and the agency workers trying to develop a plan to help the family. The guardian ad litem testified that Mother had become so "confrontational and

aggressive" with her that she was compelled to obtain a court order relieving her of her duty to visit Mother's and Mr. G.'s home alone out of fear for her safety. In addition, she testified that Mother had reported to her that Mr. G. was using drugs, although Mother later recanted that statement.

{¶38} While there was no other evidence of Mr. G.'s drug use, Mother submitted to a drug swab for the agency a couple weeks before the dispositional hearing. The caseworker testified that Mother tested positive for high levels of methamphetamine and amphetamines. Mother did not dispute the test results, agreed that using methamphetamine was not a good choice, but denied a history of drug use, asserting that her use in this instance "just happened."

{¶39} The guardian ad litem recommended that the juvenile court award temporary custody of the child to CSB and maintain her placement in Grandmother's home. She emphasized that there were clear underlying issues that resulted in Mother's inability to interact with others without aggression, to maintain a physically clean and uncluttered home in the interest of safety, and to ensure that the child attended school regularly. The guardian ad litem testified that it was critical to the child's well-being and family reunification efforts to determine whether the underlying concerns were based on mental health, substance use, or a combination of both issues so that CSB could develop a service plan designed to help Mother remedy the concerns adversely affecting the child's needs. Both the guardian ad litem and the caseworker emphasized that reunification was the goal in this case.

{¶40} The caseworker testified that L.O.-D. was placed in Grandmother's home, where the child's adult sister and her husband also reside, in the interest of keeping L.O.-D. with her family. Although the transition was difficult for everyone at first, the child is doing well there. She has a close bond with her sister and brother in law who is a teacher who helps the child get

caught up on school subjects. Grandmother ensures that L.O.-D. attends school regularly, and the child's grades have risen from Fs to Bs and Cs. L.O.-D. has developed a positive social network, having made multiple new friends in school and at church.

{¶41} When asked what steps she would take to ensure the child's school attendance if L.O.-D. were returned to her care, Mother merely reiterated excuses for the child's past absences. Mother asserted that any past truancy issues "had been resolved." She testified that she had planned for the 2024-2025 school year to be different, that the child would attend every day and on time. For example, Mother would set out the child's clothes for the week, pack her lunch the night before, and ensure that the child had bathed and finished her homework. Mother testified that those efforts fell apart, however, because "life happened." She offered no assurance that she was now in a position to ensure the child's attendance at school or to pursue services to address the child's emotional needs.

{¶42} On the other hand, CSB facilitated an intake appointment at Ohio Guidestone to address the child's exposure to domestic violence and resulting trauma, as well as her adjustment to the recent changes in her life, including removal from Mother's home and the resumption of regular school attendance. L.O.-D. would begin counseling services soon.

{¶43} Although the child's removal and placement with Grandmother caused some tension between Mother and Grandmother, Mother testified that she loves her mother and sister who lives in that home, and she believed that the family members could remain civil with one another. L.O.-D. told the guardian ad litem that there were several things she did not like about living in Grandmother's home, including a lack of privacy, policing of the child's wardrobe, and having to seek permission before eating food. After the guardian ad litem discussed these concerns with Grandmother, Grandmother arranged for a separate bedroom for the child, allowed her to

choose her own outfits, and filled the refrigerator with healthy snacks the child could eat as she wished.

{¶44} The guardian ad litem was concerned that L.O.-D. reported that she "would rather live with strangers than have to stay with [Grandmother]." Nevertheless, when the guardian ad litem asked the child what she would like to see happen, L.O.-D. never said that she wished to return to Mother's home. The child merely said that she did not know. Although the guardian ad litem was concerned by the child's early aversion to staying with Grandmother, she reported that she now observes the child to talk and laugh with Grandmother.

{¶45} Based on our review, this Court concludes that the juvenile court's finding that temporary custody of L.O.-D. to CSB was in the best interest of the child is not against the manifest weight of the evidence. The agency presented evidence demonstrating that the environment Mother could provide for the child was no more conducive to the child's well-being than the environment from which she was removed. Mother had no plan to ensure the child's school attendance or enroll her in trauma counseling. She continued to live in a home rife with untenable clutter. In addition, there was now evidence of Mother's recent use of methamphetamine, and her demonstrated lack of understanding as to the significance of drug use and its potential to negatively impact the child's well-being. Under these circumstances, the juvenile court did not err by placing L.O.-D. in the temporary custody of CSB.

{¶46} Based on the reasons enunciated above, Mother's assignment of error is overruled.

III.

{¶47} Mother's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

CARR, P. J.
STEVENSON, J.
CONCUR.


APPEARANCES:

ALISA BOLES, Attorney at law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.