[Cite as *In re W.M.*, 2022-Ohio-1978.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

IN RE: W.M., B.M.

COURT OF APPEALS NO. {48}L-22-1016

TRIAL COURT NO. JC 21285710

**DECISION AND JUDGMENT**

Decided: June 10, 2022

* * * * *

Travelle D. Riley and Anthony R. McGeorge, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**ZMUDA, J.**

## I.     Introduction

{¶ 1} Appellant, P.M. ("mother"), appeals the judgment of the Lucas County

Court of Common Pleas, Juvenile Division, granting a motion for permanent custody

filed by appellee, Lucas County Children Services ("LCCS"), thereby terminating her

parental rights with respect to her minor children, W.M. and B.M. (collectively referred to as "the children").[1] Finding no error below, we affirm.

## A. Facts and Procedural Background

**{¶ 2}** On August 9, 2021, LCCS filed its "Complaint in dependency and neglect: permanent custody and motion for shelter care hearing." In its complaint, LCCS alleged that it had a history with mother and her family. According to LCCS, mother had lost permanent custody of three other children. Further, two previous complaints were filed relating to W.M. and B.M., one in 2018 and another in 2020, based upon domestic violence between the parents. Mother completed case plan services that were implemented after these complaints were filed, and protective supervision was terminated in 2021.

**{¶ 3}** However, On August 6, 2021, LCCS received a referral alleging that the children were left unattended for up to three hours in a vehicle while mother and father donated plasma. The Toledo Police Department responded to the scene and arrested both parents for child endangering, and the children were treated for overheating and dehydration.

**{¶ 4}** On the same day LCCS filed its complaint, the juvenile court held an evidentiary hearing, at which it noted that mother and father were incarcerated and found that the children needed to be placed in shelter care for their protection. Thus, the court

---

[1] The children's father did not file a notice of appeal challenging the judgment of the juvenile court, and he is therefore not a party to this appeal.

2.

granted interim temporary custody of the children to LCCS and set the matter for a disposition hearing. The court appointed counsel for mother and a guardian ad litem for the children, and the matter proceeded through discovery and motion practice.

{¶ 5} On December 15, 2021, the matter came before the juvenile court for an adjudication and disposition hearing. At the hearing, LCCS called two witnesses during the adjudication phase of the hearing and one additional witness at disposition. Mother took the stand as her sole witness during the adjudication phase and called one additional witness at disposition.

{¶ 6} LCCS first called its assessments caseworker, Jaime Mancha, to the stand. Mancha testified as to the details surrounding the August 6, 2021 incident that prompted LCCS's involvement with the children in this case. She indicated that there was a protection order between mother and father that was in effect on that day. Mancha stated that W.M. was dehydrated when he was rescued by Toledo police. She elaborated that W.M. was "sweating a lot. It was warm outside due to the child being left in the car. It was very warm that day. The child was extremely thirsty." Nonetheless, Mancha acknowledged that the child endangering charges against mother had been dismissed by the time of the hearing.

{¶ 7} In addition to the foregoing, Mancha explained that mother is a tier II sex offender and has a history with LCCS, having had her parental rights previously terminated with respect to three other children. Mancha also stated that "there was a history of some domestic violence" between mother and father.

3.

**{¶ 8}** As its second witness, LCCS called its ongoing caseworker, Karena Vebenstad, to the stand. Vebenstad testified that she had a history with the family, having inherited the case from a prior caseworker in January 2021. According to Vebenstad, mother "has a history of 13-plus referrals with [LCCS] over the years starting with her first children. She has three children older than the two children that she has currently that we're currently in court for now. She does not have possession or custody of those children either."[2] Vebenstad explained that LCCS's concerns with mother were the same concerns that were present in prior proceedings involving mother, namely "concerns for domestic violence, concerns for lack of follow through with care for her children, dirty home referrals, concerns for her mental health and concerns for the relationship that she has with [father]."

**{¶ 9}** As to the children, Vebenstad noted that W.M. was removed from mother's care as an infant due to concerns over his safety. Moreover, Vebenstad explained that the children were previously adjudicated dependent and were, at one point, placed into LCCS's protective supervision. According to a police report referenced by Vebenstad, when the children were discovered in the unattended vehicle on August 6, 2021, they were "sitting in car seats with the windows rolled halfway down and the car was off. Both children were sun burned from sitting in the sun for an extended period of time,

---

[2] On cross-examination, Vebenstad acknowledged that mother's parental rights were involuntarily terminated with respect to two of these older children. One of the older children were voluntarily placed up for adoption by mother.

4.

sitting in soaked diapers.  * * * Both children were damp from sweat and [W.M.] had a high temperature."

{¶ 10} Vebenstad testified that W.M.'s behavior, which was previously characterized by aggression toward B.M., has improved in foster care.  She stated that W.M.'s aggression has decreased and W.M. is now "using more words."  Likewise, B.M.'s condition has improved in foster care.  According to Vebenstad, B.M. was developmentally delayed and unable to sit up on her own when she was placed in foster care.  Since that time, B.M. has developed the ability to sit on her own, crawl, and speak "some words."  When asked about potential placement for the children with father's uncle, E.M., Vebenstad indicated that this placement was not possible because E.M. was presently residing with father.  In sum, Vebenstad reported that the children have made "significant progress" while in foster care.

{¶ 11} Following Vebenstad's testimony, LCCS rested.  Thereafter, mother took the stand.  At the outset of her testimony, mother stated that the child endangering charges pertaining to the children were dismissed by the state after body camera footage from law enforcement officers showed that the children "were not unattended, but they were left with their father."  Mother explained that father was in the vehicle with the children, and she insisted that the children's sunburn occurred at a water park two days prior to mother's arrest.  Mother further indicated that B.M. was not sweaty or damp when EMS arrived on the scene.

5.

**{¶ 12}** Continuing in her testimony, mother acknowledged that she was with father at the plasma donation center, in violation of the civil protection order that was in place at the time. However, mother explained that she was with father only because he would not give her the keys to her vehicle unless she accompanied him. Further, mother stated that she called the police every time father violated the civil protection order. Mother also confirmed that father resides with his uncle, E.M., at E.M.'s home.

**{¶ 13}** On cross-examination, mother admitted that she and her family had a history with LCCS that involved parental concerns and domestic violence concerns. As part of her prior case plan services, mother was expected to address her domestic violence issues relating to her relationship with father. Nonetheless, mother acknowledged that she was with father on the day of her arrest, and she further admitted that she left the children in father's care while she donated plasma. Regarding her decision to place the children in father's care, mother stated:

> It was not the best decision at that time. My intentions [were] pure, like I said, but it's hard when you feel like you are in that type of situation and you feel like you have your back against the wall. I called the police like I was supposed to and they can't even do anything to help like they were supposed to. Because if they would have [run] the CPO when I brought it to them when he was still present, this situation wouldn't be the way it is right now.

6.

{¶ 14} Later in her testimony, mother was asked whether she reported her vehicle stolen prior to going to the plasma donation center with father. Mother testified that she did not report the vehicle stolen, "because [she] did not know the plate number on the car." Mother further acknowledged that she did not call the police to report father's violation of the civil protection order prior to going with father to the plasma donation center. She explained that the police "didn't help me the first time, what would make me think they [were] going to help me a second time." Moreover, mother disclosed that she did not call the police once inside the plasma donation center to report father's presence.

{¶ 15} At the conclusion of her testimony, mother rested with respect to the adjudication phase of the hearing. Thereafter, the court heard statements from the parties, and ultimately determined that the children were neglected and dependent based upon mother's decision to leave the children in the vehicle, either with father who was violent or completely unattended. The matter then proceeded to the disposition phase of the hearing.

{¶ 16} Mother called the first witness, S.L., during the disposition phase of the hearing. S.L. and mother are close friends. S.L. testified that mother has previously attempted to move to Kentucky to live with her. S.L. stated that she has only ever spoken with the children over video conferencing technology. S.L. has never met the children in person. Moreover, S.L. indicated that she last saw mother face-to-face "about ten years ago."

7.

{¶ 17} During mother's previous testimony, she expressed a desire to have the children placed with S.L. Regarding this potential placement, S.L. stated that Vebenstad contacted her and presented the idea of adoption or permanent custody, but S.L. indicated to Vebenstad that she "would rather do the legal custody but if [she] had to, then [she] would do permanent and then * * * talk about adoption down the road." S.L. explained that she remained willing to accept legal custody of the children despite having never met them face-to-face.

{¶ 18} Following S.L.'s testimony, LCCS recalled Vebenstad to the stand. Vebenstad reiterated some of her previous testimony and indicated that LCCS was seeking permanent custody of the children, and expressed her conviction that such permanent custody was in the children's best interests. Vebenstad explained her reasoning behind seeking permanent custody, stating that the children "deserve permanency" and noting that W.M. has "spent more of his life in substitute care that he has in the custody and possession of his own mother."

{¶ 19} Vebenstad rebuffed mother's suggestion that the children be placed with S.L., reasoning that such placement was "not appropriate." Vebenstad testified that she spoke with S.L. and explained LCCS's intention to pursue permanent custody of the children. S.L. initially expressed interest in adopting the children, but she failed to return two phone calls from Vebenstad thereafter. According to Vebenstad, she left voicemails for S.L. following each of her follow-up phone calls. Vebenstad also cited the lack of any long-term bond between S.L. and the children as a basis for finding placement of the

8.

children with S.L. inappropriate. Additionally, Vebenstad cited LCCS's lack of knowledge as to S.L.'s background and criminal history as further reasoning behind the conclusion that S.L. was not a suitable placement for the children.

{¶ 20} The final witness to testify at the hearing was the children's guardian ad litem, Robin Fuller. Based upon her interactions with the family in this case, Fuller expressed the belief that the children were neglected and that mother is incapable of making safe decisions for the children. Fuller also expressed concern over the repeated incidents of domestic violence between mother and father that continued during the pendency of this case. Fuller testified, "I believe we were lucky this time that the police were called and the kids were removed because I'm not sure what would happen if the kids continue to remain with mother while [mother and father] continue to see each other and continue to have this ongoing domestic violence. Nothing has changed."

{¶ 21} In light of the foregoing concerns, Fuller indicated that her recommendation was an award of permanent custody of the children to LCCS. She opined that permanent custody to LCCS was in the children's best interests and noted that the children are presently thriving in foster care. As to the children's current placement, Vebenstad indicated the children are "doing really well."

{¶ 22} At the conclusion of Fuller's testimony, the parties rested. Following closing statements, the juvenile court found that LCCS proved that permanent custody was in the children's best interests, noting the children's need for permanency and their improvement in foster care. The court further found that mother failed to implement the

9.

principles she learned in domestic violence counseling and put her children in jeopardy by continuing in her relationship with father despite the existence of the civil protection order barring such relationship.

{¶ 23} On January 11, 2022, the juvenile court memorialized its decision in a ten-page judgment entry. In its entry, the court found that the children were dependent under R.C. 2151.04(D)(1)(2) and 2151.04(B), and neglected under R.C. 2151.03(A)(2). Further, the court found that the children could not be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a) and permanent custody to LCCS was in the children's best interests under R.C. 2151.414(D)(1).

{¶ 24} In support of its finding that the children could not be placed with mother within a reasonable time or should not be placed with mother, the juvenile court examined the relevant evidence and found that mother has previously had her parental rights terminated with respect to the children's siblings and has failed to prove that she can provide a legally secure permanent placement and adequate care for the children under R.C. 2151.414(E)(11). Further, in support of its best interests determination under R.C. 2151.414(D)(1), the court found that the children needed a legally secure permanent placement and that there were no relatives available to care for the children.

{¶ 25} Based upon the foregoing findings, the juvenile court granted LCCS's motion for permanent custody, thereby awarding permanent custody to LCCS. One week after the juvenile court issued its judgment entry, mother filed her timely notice of appeal.

10.

## B. Assignments of Error

{¶ 26} On appeal, mother assigns the following errors for our review:

I. The trial court's finding of dependence pursuant to R.C. [2151.04(D)] and R.C. 2151.04(B), and neglect pursuant to R.C. 2151.03(A)(2) were not supported by sufficient evidence, or in the alternative, were against the manifest weight of the evidence as regards adjudication of these children.

II. The trial court's finding that the children should not be placed with either parent and/or that it would be contrary to the best interests of the children to be reunified with either parent pursuant to R.C. 2151.414(B)(1)(a) and R.C. 2151.414(D)(1) was not supported by clear and convincing evidence as to disposition of this matter.

III. The trial court's denial of mother's request for legal custody to a third party family friend was not supported by clear and convincing evidence.

## II. Analysis

## A. Dependency/Neglect Determination

{¶ 27} In her first assignment of error, mother argues that the juvenile court's determination that the children are dependent and neglected was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 28} A finding of dependency and neglect must be supported by clear and convincing evidence. R.C. 2151.35. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Once the clear and convincing standard has been met to the satisfaction of the juvenile court, 'the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.'" *In re B.B.*, 3d Dist. Defiance No. 4-10-17, 2012-Ohio-2695, ¶ 33, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

{¶ 29} Here, the juvenile court found that the children were dependent under, inter alia, R.C. 2151.04(B), which provides:

> As used in this chapter, "dependent child" means any child:
>
> * * *
>
> (B) Who lacks adequate parental care by reason of the mental or
>
> physical condition of the child's parents, guardian, or custodian;

Similarly, the juvenile court found the children were neglected under R.C. 2151.03(A)(2), which provides:

> (A) As used in this chapter, "neglected child" includes any child:
>
> * * *
>
> (2) Who lacks adequate parental care because of the faults or habits
>
> of the child's parents, guardian, or custodian;

12.

{¶ 30} Under R.C. 2151.011(B)(1), "adequate parental care" is defined as "the provision by a child's parent or parents * * * of adequate * * * shelter to ensure the child's health and physical safety." This definition has been construed by Ohio courts to "include a parent's inability and unwillingness to provide her children with shelter to protect their physical health and safety from ongoing domestic violence." *In re C.A. Children*, 1st Dist. Hamilton No. C-200172, 2020-Ohio-5243, ¶ 37, citing *In re T.B.*, 12th Dist. Fayette No. CA2014-09-019, 2015-Ohio-2580, and *In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933. In our decision in *In re A.C.*, we found that the effect upon the children of ongoing domestic violence against mother in the home, among other concerns, supported a finding of neglect under R.C. 2151.03(A)(2). *In re A.C.* at ¶ 51.

{¶ 31} In her brief, mother argues that the "the instance relied on by the agency and the court to terminate mother's parental rights does not rise to the level of dependency or neglect, when the charges against her were dropped, and the police found [father] to be present in or around the vehicle where the children were waiting for their mother to donate plasma."

{¶ 32} At the hearing conducted in this case, Mancha testified that W.M. was dehydrated, sweating, and extremely thirsty when he was found by Toledo police in appellant's vehicle on August 6, 2021. While Mancha acknowledged that the child endangering charges against mother were subsequently dismissed, she did not indicate a cause for the dismissal. Further, Vebenstad testified that LCCS's concerns with mother were the same concerns that were present in prior proceedings involving mother, namely

13.

"concerns for domestic violence, concerns for lack of follow through with care for her children, dirty home referrals, concerns for her mental health and concerns for the relationship that she has with [father]." Vebenstad noted that W.M. was previously removed from mother's care as an infant due to concerns over his safety. Moreover, Vebenstad explained that the children were previously adjudicated dependent and were, at one point, placed into LCCS's protective supervision.

{¶ 33} As to the August 6, 2021 incident, Vebenstad stated that the children were sitting in their car seats inside appellant's hot vehicle with sunburns and soaked diapers. She further testified that the children were sweaty and W.M. had a high temperature.

{¶ 34} For her part, mother stated that the child endangering charges pertaining to the children were dismissed by the state after body camera footage from law enforcement officers showed that the children "were not unattended, but they were left with their father." Mother points to this evidence on appeal to demonstrate that the juvenile court's findings of dependency and neglect were unfounded and not based on clear and convincing evidence.

{¶ 35} We find no merit to mother's contention that the juvenile court's dependency and neglect findings were unsupported by sufficient evidence and against the manifest weight of the evidence where the child endangering charges filed against her were eventually dismissed. First, the record is not conclusive as to the basis for the state's decision to dismiss the child endangering charges. While mother testified that the dismissal of the charges was due to police officers' body camera footage depicting father

14.

accompanying the children at the time of the police officers' arrival on the scene, such footage does not lead to the inevitable conclusion that the children were accompanied by father for the hours preceding the officers' arrival while mother was inside the plasma donation center. The police received a tip from an unidentified witness who reported that the children were left unattended in the vehicle. The fact that father had returned to the vehicle sometime between the point at which the children were observed by the tipster and the arrival of the officers does not mean that father was with the children the entire time mother was donating plasma.

{¶ 36} Second, accepting as true mother's contention that the children were actually accompanied by father the entire time she was donating plasma, leaving the children in the sole supervision of father provides its own basis for the juvenile court's finding of dependency and neglect in light of father's history of domestic violence and the existence of a civil protection order prohibiting father from being around mother.[3]

{¶ 37} As noted above, the juvenile court found that the children were dependent based, in part, upon their lack of adequate parental care by reason of the mental or physical condition of their parents. The decision to continue to place one's child in the presence of a domestic violence abuser is reflective of a mental condition negatively impacting the ability to care for the child, and evidence of such decision-making is supportive of a dependency finding under R.C. 2151.04(B). *Id re Hurst*, 3d Dist. Seneca

---

[3] Notably, the civil protection order is not contained in the record before us. Therefore, we are unable to ascertain whether the order, in addition to precluding father's contact with mother, also bars father from having contact with the children.

Nos. 13-03-27, 13-03-28, 2003-Ohio-5460, ¶ 12. Indeed, in *In re L.R.*, 9th Dist. Lorain Nos. 18CA011378, 18CA011385, 2019-Ohio-1152, the Ninth District found that a juvenile court's dependency finding under R.C. 2151.04(B) was not against the manifest weight of the evidence where the mother continued to allow the children to be cared for by their father even after a domestic violence civil protection order was issued against the father. *Id.* at ¶ 33. Similarly, we have previously found that domestic violence between parents is a relevant consideration in evaluating a parent's mental and physical condition under R.C. 2151.04(B). *See In re Brittany W.*, 6th Dist. Lucas No. L-04-1202, 2005-Ohio-3201, ¶ 37.

{¶ 38} Given this authority, we find that mother's insistence that the children were left in the care of their father, and not unattended, is misguided. Importantly, mother's alleged abandonment of the children in the vehicle while she donated plasma was not the sole basis for the determination that the children were dependent and neglected. Mother's refusal to disassociate with father, who has a history of domestic violence involving mother, is an additional and independent basis for concluding that mother's mental condition prevented her from providing adequate parental care. Thus, whether the children were left unattended as argued by LCCS, or accompanied by their father as urged by mother, the evidence in the record clearly and convincingly establishes that the children lacked adequate parental care by reason of the mental condition of their mother, pursuant to R.C. 2151.04(B). Further, this evidence supports the court's neglect finding under R.C. 2151.03(A)(2) and 2151.011(B)(1). *In re C.A. Children*, *supra*, at ¶ 37.

16.

Therefore, the juvenile court's dependency and neglect determination was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 39} Accordingly, mother's first assignment of error is not well-taken.

## B. Grant of Permanent Custody

{¶ 40} In mother's second assignment of error, she argues that the juvenile court's findings that (1) the children could not be placed with either parent within a reasonable time or should not be placed with either parent under R.C. 2151.414(B)(1)(a) and (2) permanent custody to LCCS was in the children's best interests under R.C. 2151.414(D)(1) were not supported by clear and convincing evidence. In essence, mother argues that the juvenile court erred in awarding permanent custody of the children to LCCS.[4]

{¶ 41} "A juvenile court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. In conducting a review on manifest weight, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest

---

[4] Mother frames her assignment of error in terms of the impact of the juvenile court's decision on both parents. However, the argument she advances in her brief is limited to the propriety of the juvenile court's decision as to her, not father. Since mother lacks standing to raise the argument on behalf of father, and given father's decision not to appeal the juvenile court's decision, we will limit our analysis to mother.

17.

miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17.

{¶ 42} As the trier of fact, the juvenile court is in the best position to weigh the evidence and evaluate the testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Thus, "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

{¶ 43} "R.C. 2151.414 sets out specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 18. Relevant here, the juvenile court "must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest." *Id.*

{¶ 44} Here, the juvenile court concluded that permanent custody to LCCS was warranted based on its finding that the children could not be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a), which provides:

18.

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 45} Concerning the determination as to whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, R.C. 2151.414(E) provides, in relevant part:

If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 46} In the case sub judice, the juvenile court found R.C. 2151.414(E)(11) was applicable in this case.

{¶ 47} LCCS introduced testimony establishing that mother previously had her parental rights involuntarily terminated with respect to two of the children's older siblings, and LCCS's witness, including the children's guardian ad litem, testified that

mother could not provide a legally secure permanent placement for the children under R.C. 2151.414(E)(11). The juvenile court agreed.

{¶ 48} Mother does not dispute that she has previously had her parental rights terminated with respect to the children's older siblings. Therefore, under R.C. 2151.414(E)(11), the burden shifted to mother to provide clear and convincing evidence to prove that she could provide the children with a legally secure permanent placement and adequately care for their health, welfare, and safety.

{¶ 49} The evidence contained in the record demonstrates that mother has refused to disassociate herself from father, despite repeated incidents of domestic violence and a civil protection order that forbids the two from seeing one another. This evidence demonstrates that mother is incapable of providing the children with a secure permanent placement, and mother has failed to meet her burden to prove otherwise. Thus, in light of the record before us, we do not find that the juvenile court lost its way in making its finding under R.C. 2151.414(E)(11). Having made that findings, the juvenile court was required to conclude that the children cannot be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a). *See* R.C. 2151.414(E).

{¶ 50} In addition to its determination that the children could not be placed with mother within a reasonable time or should not be placed with mother, the juvenile court also found that an award of permanent custody to LCCS was in the children's best interests under R.C. 2151.414(D)(1), which provides, in relevant part:

21.

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

* * *

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 51} In considering the child's best interest, the juvenile court is not required to discuss each of the factors under R.C. 2151.414(D)(1)(a) through (e), and the factors outlined therein are not exhaustive. *In re A.M.*, *supra*, Slip Opinion No. 2020-Ohio-5102, at ¶ 31. Indeed, "[c]onsideration is all the statute requires." *Id.*

{¶ 52} The juvenile court expressly indicated its consideration of the children's best interests under R.C. 2151.414(D)(1) in its judgment entry. In support of its best interests determination, the juvenile court found that the children "deserve a legally safe,

22.

secure and permanent environment. A permanent placement at this time cannot happen without LCCS being granted permanent custody of the children." This finding is supported by the evidence we reviewed above concerning the prevalence of domestic violence in mother's home and mother's failure to disassociate herself from father. Further, the juvenile court's determination that R.C. 2151.414(E)(11) is applicable in this case supports its best interest determination under R.C. 2151.414(D)(1)(e). Moreover, LCCS's witnesses, including the children's guardian ad litem, each testified that the children are doing well in foster care, a fact that is relevant to the best interest determination under R.C. 2151.414(D)(1)(a).

{¶ 53} Given the evidence introduced by LCCS in the trial below, we find that clear and convincing evidence supports the juvenile court's determination that an award of permanent custody to LCCS was in the children's best interests under R.C. 2151.414(D)(1). Having already concluded that the juvenile court did not lose its way in finding that the children cannot be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a), we find that the juvenile court's award of permanent custody to LCCS in this case was not against the manifest weight of the evidence.

{¶ 54} Accordingly, mother's second assignment of error is not well-taken.

23.

## C. Denial of Legal Custody to S.L.

{¶ 55} In mother's third assignment of error, she contends that the juvenile court erred in denying her request for an award of legal custody of the children to S.L. In response, LCCS contends that mother does not have standing to raise this argument.

{¶ 56} In *In re A.B.*, 6th Dist. Lucas Nos. L-12-1069, L-12-1081, 2012-Ohio-4632, we examined, and rejected, an argument similar to mother's argument in this case. There, we found that the appellant lacked standing to challenge the juvenile court's denial of legal custody to a maternal grandmother. In so doing, we approvingly quoted the following language from a decision of the Ninth District,

> This Court has held that a parent has standing to challenge the trial court's failure to grant a motion for legal custody filed by a non-parent because the court's denial of that motion led to a grant of permanent custody to the children services agency, which impacted the residual rights of the parent. The parent has standing to challenge only how the court's decision impacted the parent's rights, however, not the rights of the third party. In other words, Mother has no standing to assert that the court abused its discretion by failing to grant her friend legal custody of J.J. Her challenge is limited to whether the court's decision to terminate her parental rights was proper. (Citations omitted.)

*In re J.J.*, 9th Dist. Summit No. 21226, 2002-Ohio-7330, ¶ 36.

24.

**{¶ 57}** After quoting the foregoing language in *In re A.B.*, we observed that "appellants make no new legal argument that the juvenile court's permanent custody decision was erroneous," and we therefore rejected appellants' argument. *In re A.B.* at ¶ 30. Similarly, mother does not advance any argument as to how the juvenile court's refusal to grant legal custody of the children to S.L. rendered the juvenile court's permanent custody decision erroneous. Moreover, we find that the juvenile court's reluctance to grant legal custody of the children to S.L. understandable in light of the lack of any prior interaction between S.L. and the children. Indeed, S.L. acknowledged during her testimony that she has never even met the children, and has only seen them via video conferencing.

**{¶ 58}** In light of the foregoing, we find that the juvenile court did not err in denying mother's request for an award of legal custody to S.L. Accordingly, appellant's third assignment of error is not well-taken.

### III. Conclusion

**{¶ 59}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.
_____
JUDGE


Christine E.Mayle, J.
_____
JUDGE


Gene A. Zmuda, J.
CONCUR
_____
JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.