[Cite as *In re J.T.*, 2024-Ohio-2570.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re J.T. A.T. H.T.

Court of Appeals Nos.  H-24-002
H-24-003
H-24-004
H-24-005
H-24-006
H-24-007

Trial Court Nos.  DNA020220008
DNA020220009
DNA020220010
DNA020000008

**DECISION AND JUDGMENT**

Decided:  July 3, 2024

* * * * *

Richard H. Palau, for appellee.

Joseph Sobecki, for appellant, S.T.

W. Alex Smith, for appellant, G.M.

* * * * *

**SULEK, P.J.**

{¶ 1} In these consolidated appeals, Appellants Gwen M. ("Mother") and Seth T.

("Father") appeal judgments of the Huron County Court of Common Pleas, Juvenile

Division, terminating their parental rights and awarding permanent custody of their minor

children, J.T., A.T., and H.T., to appellee Huron County Department of Job and Family Services ("HCDJFS"). For the reasons that follow, the juvenile court's judgments are affirmed.

## I. Facts and Procedural Background

{¶ 2} Mother and Father are the parents of J.T., born in 2017; A.T., born in 2020; and H.T., born in 2021. Throughout the juvenile court proceedings, Father had a guardian due to a prior adjudication of incompetence in Huron County Probate Court.[1] Father's guardian appeared at all hearings and communicated with the court and case workers on Father's behalf.

### A. HCDJFS's Temporary Custody of the Children

{¶ 3} On January 21, 2022, HCDJFS filed a complaint in dependency, abuse, and neglect for each of the three children and requested that the court grant legal custody of the children to HCDJFS with protective supervision or permanent planned living arrangements. HCDJFS alleged that in August 2021, it received a complaint that the children's home contained animal feces and broken glass.

{¶ 4} The parents initially agreed to a voluntary case plan in which Father would address his mental health and both parents would address environmental concerns in the home. Shortly thereafter, the parents agreed to complete counseling and parenting

---

[1] At the time of the juvenile court's judgment, a hearing had been scheduled in Huron County Probate Court to determine whether father continued to need a guardian.

2.

classes, connect with Help Me Grow services for the children, and maintain their home. They subsequently indicated, however, that they did not want to complete the case plan.

{¶ 5} HCDJFS's complaints also alleged that it received a report that methamphetamine users moved into the family's home, and when HCDJFS attempted to visit the home in January 2022 to investigate the report, Father was in the process of being arrested on charges of burglary and breaking and entering. At the time the complaints were filed, Father was still incarcerated at the Huron County Jail. The complaints further alleged that due to the reports of drug activity in the home, HCDJFS requested on multiple occasions that Mother complete a drug screen, but she refused.

{¶ 6} Next, the complaints alleged that no extended family members were willing to care for the children, and Mother threatened suicide if her children were removed.

{¶ 7} Finally, HCDJFS asserted that caseworkers had attempted several interventions to prevent the removal of the children, including adding protective daycare to the case plan, referring the parents to local counseling, referring the children for Help Me Grow Services, connecting Father with vocational counseling, and providing applications for many other community programs and services, but the parents either refused to participate or failed to complete necessary applications.

{¶ 8} On January 21, 2022, the juvenile court held an emergency shelter care hearing. It appointed a guardian ad litem for the children and placed them into the

3.

temporary custody of their maternal grandfather under the protective supervision of HCDJFS.[2] Mother and Father were each granted supervised visitation with the children.

{¶ 9} On March 31, 2022, the court held a dispositional hearing in all three children's cases and issued a written order placing the children into the temporary custody of their maternal grandfather under HCDJFS's protective supervision. Mother and Father were granted joint supervised visitation with the children for two hours each week. The court ordered Mother and Father each to submit to a mental health assessment, actively participate and successfully complete any recommended treatment; sign releases of information regarding mental health counseling; submit to random substance abuse screens as requested by HCDJFS; and consistently maintain a clean and safe home. Mother also had to obtain and maintain employment sufficient to meet her needs as well as her children's needs; apply for protective day care services; and work with Help Me Grow for two of the children and follow all recommendations.

{¶ 10} On July 20, 2022, the court held another dispositional hearing and found that Mother and Father continued to be unfit or unsuitable for custody of the children because they had not remedied the conditions that contributed to the children's dependency. Further, the children's maternal grandfather was no longer willing to be a temporary custodian of the children, and therefore the court found the children had no appropriate relatives who were willing to be temporary custodians. Accordingly, the

---

[2] The court also ordered that Mother's older son, E.M., would be placed in the temporary custody of his maternal grandmother. Like his younger siblings, E.M. was never returned to the custody of Mother, but his custody is not a subject of the instant appeals.

4.

court granted HCDJFS temporary custody of the children, and the children were placed into foster care.

{¶ 11} On October 6, 2022, HCDJFS moved to modify the parents' visitation with the children. HCDJFS maintained that on September 1, 2022, Father was charged with assault against Mother in Norwalk Municipal Court, and the court in that case placed Father on active probation for two years as well as ordered that Father have no contact, indirect or direct, with Mother for two years. Accordingly, HCDJFS requested that the juvenile court split the visitation time between the parents for a maximum of three hours per week. Mother's attorney and Father's guardian each filed a response seeking their own two hours of visitation, and the children's guardian ad litem recommended that the court split three hours of visitation time equally between the parents. On October 8, 2024, the court granted each parent 90 minutes of visitation time with the children and ordered that HCDJFS make accommodations for Father to enter and exit the agency's building without having contact with Mother in accordance with the no-contact order issued by Norwalk Municipal Court.

## B. Permanent Custody Hearing

{¶ 12} Nearly two years after the initial complaint was filed, on January 10, 2024, the juvenile court held a hearing on HCDJFS's motion for permanent custody and legal custody of the children. During the hearing, Dawn Kennard and Tara Dunn, who were caseworkers for HCDJFS, testified about the history of HCDJFS's temporary custody of the children and the case plan that HCDJFS developed for the parents. Kennard testified

5.

that she was assigned to the case in August 2022 and remained on the case through November 2023, when she left her employment with HCDJFS. Dunn testified that she was assigned to the case after Kennard left her employment and was still assigned to the case at the time of the hearing.

{¶ 13} When Kennard was assigned to the case in August 2022, the children had just been removed from the temporary custody of their maternal grandfather and placed into foster care. Kennard explained that the children's maternal grandfather requested that HCDJFS take custody of the children because he could not care for them.

{¶ 14} The parents' case plan was likewise being amended in August 2022. Kennard testified that although the case plan was amended several times, the final case plan objectives required both parents to submit for mental health and substance use assessments, take all prescribed medication, follow all court orders, sign record releases, be open and honest with mental health providers, and maintain housing and financial stability.

{¶ 15} Kennard, who met with the family at least monthly, testified that although both parents completed some of their case plan objectives, neither parent met all of the objectives. The case plan objectives met included both parents' completion of parent classes as well as compliance with some of the mental health objectives.

{¶ 16} In addition, although both parents tested positive for marijuana more than once, Mother complied with her substance abuse goals. She completed a substance abuse

6.

assessment and appeared for her appointments with a counselor to address her issues. Kennard did not consider substance abuse to be a major concern for Mother.

{¶ 17} Mother and Father consistently appeared for their weekly supervised visits with the children. During the visits, both parents initially relied on technology to keep the children occupied. The parents were instructed to cease giving technology to the children during visits, but Father did not always comply, at times giving the children his phone. Kennard noted, however, that Father was more engaged with the children during the visits, while Mother was often on her phone during visits and thus not engaged with the children.

### Testimony regarding Mother

{¶ 18} Kennard also noted that Mother was only employed part-time and to Kennard's knowledge had no other source of income. Although Mother was initially employed at a convenience store, she lost that job after she was arrested for selling alcohol to underage individuals at work. Mother then secured a part-time job working at a fast-food restaurant. Mother told Kennard she asked for more hours but did not get them.

{¶ 19} Kennard's testified she had significant concerns regarding Mother's mental health—primarily with respect to Mother's relationship with Father and other men—and her failure to secure independent housing.

{¶ 20} As to mental health, Mother completed mental health assessments. She was compliant in attending appointments with her counselor and was released from mental

7.

health services. Nonetheless, Kennard remained concerned that even after Mother's discharge that she was not independent and seemed to have codependency issues in her romantic relationships. Mother had a history of relationships with abusive men. Kennard testified that before this case began, Mother's first child died due to Shaken Baby Syndrome at the hands of her then-boyfriend.

{¶ 21} Mother's relationship with Father was likewise unstable, and she repeatedly reported to HCDJFS employees that Father was abusive. Kennard knew of multiple domestic violence situations between Mother and Father when they lived together in Father's residence. Indeed, Mother filed charges against Father because of a domestic violence incident in September 2022 according to Kennard's recollection. Although the court issued a no-contact order prohibiting Father from contacting Mother, both of them repeatedly violated the order, and Mother told caseworkers that she had sought to have the no-contact order removed a few times. Mother even moved back in with Father in late 2022 or early 2023, and their relationship continued to be turbulent. For example, while they were living together in late 2022 or early 2023, Father reported that Mother was self-harming, so Father grabbed the knife and cut himself, causing him to need surgery.

{¶ 22} During this case, Mother bounced back and forth between living in Father's trailer or with two other boyfriends. Depending on her relationship status, there were periods when she was homeless, and she never secured her own housing throughout the case. Kennard testified that neither of the two boyfriends with whom Mother lived had a

8.

home suitable for children, and one boyfriend never attempted to undergo a background check so that the children could live with them. One of the boyfriends attempted to steal mother's identity, and the other had a prior conviction for child endangerment.

{¶ 23} Kennard contacted Mother's counselor following Mother's discharge from counseling to discuss her continuing relationship and codependency issues. The counselor told Kennard that Mother had been taught appropriate coping skills to address her issues, and it was up to Mother to use those skills.

{¶ 24} Kennard attempted to connect Mother with stable, independent housing. She provided Mother with a list of subsidized housing providers within the geographic area Mother preferred. Kennard assisted Mother in contacting the providers and submitting applications. Kennard testified that housing availability was limited, and Mother was placed on waitlists. An apartment became available in late 2023, but Mother told Kennard that she did not pass the background check for it. When Kennard asked Mother to sign a release so that Kennard could talk with the apartment manager to potentially work out a way for Mother to get the apartment, Mother said she was not interested. Mother never secured independent housing throughout the juvenile court proceedings, and Dunn testified that Mother seemed "pretty resolved to remain in a living situation with" one of her boyfriends.

### Testimony regarding Father

{¶ 25} Kennard's primary concerns with Father included his mental health, housing, and lack of compliance with court orders.

9.

{¶ 26} Father completed mental health and substance use assessments, but he did not comply with his counselor's recommendations, failing to consistently attend appointments. Father, who was diagnosed with bipolar disorder and anti-social personality disorder by different providers, was linked with a psychiatrist at Firelands in Sandusky in 2022. Firelands Sandusky did not permit Father to return to their offices after he became belligerent during an appointment and left abruptly. Following that appointment, Father's grandmother became so concerned with Father's mental state that she contacted the Erie County Sheriff's Department because she believed he was suicidal.

{¶ 27} After Mother filed domestic violence charges against Father in September 2022, Father's case plan was amended to include a batterer's intervention class. Father attended the class for approximately 10 to 15 minutes before leaving. He told Kennard that the class was a "joke" and he would not participate in it. Father said HCDJFS was going to have to find something else for him to do.

{¶ 28} Eventually Father connected with a different Firelands location—Firelands Norwalk—where his provider determined that as an alternative to batterer's intervention, Father could participate in weekly appointments. Under his treatment plan, Father was to alternate between seeing his mental health counselor and a case manager one week, then his substance use counselor and case manager the following week. Father was not compliant with these services either. He refused to see the case manager altogether and only saw his counselors some of the time. Firelands Norwalk eventually discharged Father for noncompliance.

10.

{¶ 29} Because Father was not compliant with his counseling, he was arrested for violating his probation. Father's probation officer then connected Father with Clear Minds in November or December 2023. Father successfully completed six weeks of counseling with Clear Minds, but Kennard testified that the counseling did not address all of Father's mental health diagnoses.

{¶ 30} Father also refused to take his medication throughout the case. Because of his refusal, his medications could not be evaluated according to Kennard.

{¶ 31} Throughout most of the case, Kathy Frombaugh served as Father's guardian. Frombaugh regularly communicated with Father, HCDJFS, and the court regarding the proceedings, and she appeared at hearings with Father. Kennard testified that when HCDJFS was unable to contact Father, they would contact Frombaugh, who would communicate with Father. Frombaugh also helped to ensure Father appeared at his appointments and even drove him to appointments when necessary. However, in mid-2023, Frombaugh requested to be removed as Father's guardian because Father was hostile and verbally aggressive. In approximately October 2023, Frombaugh was released, and Brian Donnamiller became Father's guardian immediately thereafter. Like Frombaugh, Donnamiller took an active role in the case.

{¶ 32} Father also was hostile with Kennard, and beginning in spring 2023, Kennard felt unsafe conducting visits at Father's home. Accordingly, HCDJFS approved Kennard to conduct visits with Father at the agency.

11.

**{¶ 33}** Next, Father did not meet his case plan objective to provide safe housing for the children. Although Mother and Father initially rectified the cleanliness issues identified in the referral, the same issues recurred throughout the case. Kennard had continuing concerns regarding Father's trailer with respect to both its cleanliness and its construction. When the children were removed, the trailer's carpet was extremely soiled. Father later removed the carpet but did not replace it, leaving the floorboards exposed. The trailer was also missing doorways, and drywall damaged by leaks needed replaced. Kennard frequently observed animal feces and vomit on the floor.

**{¶ 34}** Father reported to Kennard in 2023 that he had obtained some construction materials and was making progress in repairing the trailer, but he told Kennard that he had not yet completed the repairs. Kennard was unable to verify if any repairs were made because her visits with Father had been moved to the agency. Dunn attempted to visit Father's residence multiple times once she began working on the case in November 2023, but he was never home during her attempts. And even though she left her card, Father never contacted her to reschedule a visit.

**{¶ 35}** Finally, one of the most serious concerns Kennard had with Father was his refusal to follow court orders. Father repeatedly saw Mother in violation of the no-contact order, even living with her at times. Dunn testified that a week before the permanent custody hearing, Norwalk Municipal Court held a hearing regarding Father's violation of the protection order. Father admitted to the violation and was ordered to serve five days in jail in February 2024.

12.

### Testimony regarding the Children

{¶ 36} Kennard also testified about the children. At the beginning of his case, J.T. had lagging skills in impulse control and self-regulation. Kennard described J.T. as "uncontrollable" and "unable to soothe." However, Kennard saw huge improvements in J.T.'s behavior after his most recent foster placement. J.T. was diagnosed with ADHD and PTSD, had anxiety, and had a speech delay. At the time of the hearing, J.T. was learning coping skills, attending counseling sessions with his school counselor, engaged in speech therapy in school, and taking medication. Kennard also noted that J.T.'s behavior got worse throughout the school week as his Friday visits with his parents approached. After his visits with them, J.T. would become physically aggressive. He would often have only a day or two of well-regulated behavior due to his anxiety surrounding his visits.

{¶ 37} Next, Kennard testified that A.T., who was three years old at the time of the permanent custody hearing, did not initially have any behavior issues when she was placed into foster care. As A.T. got older, she became more aggressive and unable to self-regulate, particularly when she was in more of a structured environment where she had to meet behavioral expectations. A.T.'s foster parents had her evaluated for counseling, and she was on a waiting list to receive services. A.T. was enrolled in preschool at the time of the permanent custody hearing. Kennard also noted that A.T. experienced increased behavioral issues surrounding visits with her parents. Like J.T.,

13.

A.T. also had a speech delay, and her foster parents were attempting to find speech therapy for her.

{¶ 38} Finally, regarding H.T., Kennard testified that he was an underweight and malnourished baby with developmental delays when he first was placed into care. H.T. immediately began receiving early intervention services through Help Me Grow, and he was still receiving services at the time of the hearing. According to Kennard, Help Me Grow indicated that with appropriate services, including speech therapy for a speech delay, H.T. would eventually close his developmental gaps. Though H.T. had not shown any anxiety preceding his visits with his parents, Kennard testified that H.T. was aggressive, violent, and unsafe with other children in his foster home after visits.

{¶ 39} Kennard testified that HCDJFS sought relative placement options for all three children but was unable to locate any willing relatives who were capable of caring for the children's high needs. Instead, the children were placed with foster families. While they were initially placed together in one foster home, the foster parents, who had years of experience as foster carers, told the agency that they could not meet the children's needs and requested the children be placed elsewhere less than a month after the placement. After several different placements, the children eventually were placed in separate foster homes. Kennard testified that separate placements permitted the foster parents to give each of the children individualized attention to address each child's specific needs. In addition, all three foster families had regular meet-ups that included their maternal grandmother and older sibling, E.M., so that the children could see each

14.

other.  Each set of the children's foster parents were certified to adopt and expressed a desire to adopt the children.

### Testimony of the Children's Guardian Ad Litem

{¶ 40} After the two HCDJFS caseworkers testified, Carrie Kimmet, the children's guardian ad litem testified.  Kimmet served as the children's guardian ad litem beginning when the children were still living with their maternal grandfather in 2022.  Kimmet testified about the children's various placements, her concerns about the children's behavior and emotional states, her observations of the children's visits with her parents, and the parents' progress on their case plan.

{¶ 41} As to the parents, Kimmet primarily expressed concern about the parents' relationship and the history of violence in that relationship as well as Mother's choices of unsafe romantic partners.  Kimmet also pointed to the parents' repeated violations of the protection order.  Kimmet also noted that Father was offered case management psychiatric services and medication management, but he refused those services. Kimmet was also concerned that one of Mother's boyfriends obtained a protection order against Father.  Kimmet emphasized that she continued to have similar concerns even after the parents were discharged from mental health counseling.

{¶ 42} As to the children, Kimmet testified that J.T. and A.T. had demonstrated serious behaviors that appeared to be trauma responses, particularly following their visits with their parents.  Kimmet opined that although she wished that the children could be placed together, separate placements were in the children's best interest.  She also

15.

recommended that the children be given the opportunity to maintain their relationships with each other and with their older sibling, E.M.

**{¶ 43}** Finally, foster parents for all three of the children testified. Each testified that they planned to adopt their respective child if the court awarded HCDJFS permanent custody.

### C. The Juvenile Court's Judgment

**{¶ 44}** Following the permanent custody hearing, the juvenile court entered its judgment terminating Mother's and Father's parental rights and awarding permanent custody of the children to HCDJFS. It found clearly and convincingly that the children had been in the temporary custody of HCDJFS for more than 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d). As to both parents, the court concluded that the children could not be placed with either of them within a reasonable time or should not be placed with them pursuant to R.C. 2151.414(B)(1)(a). Further, it found under R.C. 2151.414(E)(1) that notwithstanding reasonable case planning and diligent efforts by HCDJFS, Mother and Father failed continuously and repeatedly to substantially remedy the conditions that caused the children to be placed outside of the family home. Finally, the court found that it would be in the best interest of the children for them to be placed in the permanent custody of HCDJFS.

**{¶ 45}** In support of its decision, the juvenile court explained that although Mother and Father had complied with some of the case plan, they had not demonstrated that they were capable of providing appropriate care for the children. As to Mother, the court

16.

pointed to her failure to secure a suitable home for herself and the children, noting her dependence on men with whom she had turbulent relationships for housing. As to Father, the court pointed to his history of domestic violence with Mother and recent violation of a protective order. The court also noted Father's failure to complete various mental health services and refusal to take psychiatric medication, as well as his regular displays of hostility to HCDJFS caseworkers and other professionals assigned to assist him. Finally, the court discussed the children's exposure to trauma and domestic violence in their parents' home and the children's improvement in behavior, emotional regulation, and development since their foster placements.

### III. Assignments of Error

{¶ 46} Mother and Father each filed timely notice of appeals of the juvenile court's judgment entry granting HCDJFS's motion for permanent custody. Mother asserts the following assignment of error:

1. The Huron County Juvenile Court erred when it granted the Agency's Motion for Permanent Custody against mother, Gwen M.

Father also asserts one assignment of error:

2. The trial court erred by failing to appoint a guardian ad litem for Seth T.

### IV. Analysis

**A.    The Juvenile Court's Decision terminating mother's parental Rights is not against the manifest weight of the evidence.**

{¶ 47} Mother's assignment of error challenges the juvenile court's decision to terminate her parental rights.

17.

**{¶ 48}** "A juvenile court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re W.M.*, 2022-Ohio-1978, ¶ 41 (6th Dist.), quoting *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.). "Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 2023-Ohio-1663, ¶ 27 (6th Dist.), citing *In re T.J.*, 2021-Ohio-4085, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶ 49}** "As the trier of fact, the juvenile court is in the best position to weigh the evidence and evaluate the testimony." *In re W.M.* at ¶ 42, citing *In re Brown*, 98 Ohio App.3d 337, 342 (3d Dist. 1994). "Thus, in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re S.S.* at ¶ 28, quoting *In re W.M.*, at ¶ 42.

**{¶ 50}** Before terminating parental rights and awarding permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must first find both of the following: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) exists, and (2) permanent custody is in the child's best interests. R.C. 2151.414(B)(1). The juvenile court's findings must be supported by clear and convincing evidence, meaning the court must form a firm belief or conviction as its findings. *In re T.J.*, 2021-

18.

Ohio-4085, ¶ 36 (6th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶ 51}** Here, Mother contests the juvenile court's finding that R.C. 2151.414(B)(1)(a) applies, and she also contends that granting permanent custody to HCDJFS was not in the children's best interests.

### 1. The Juvenile Court's Finding Under R.C. 2151.414(B)(1)(a)

**{¶ 52}** R.C. 2151.414(B)(1)(a) provides that a juvenile court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, … and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met.

**{¶ 53}** Here, the juvenile court found that R.C. 2151.414(E)(1) applied to both Mother and Father.  R.C. 2151.414(E)(1) states,

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶ 54}** Notably, the juvenile court "only needed to find that one [R.C. 2151.414(E)] factor applied to support its holding." *In re C.F.*, 2007-Ohio-1104, ¶ 50; *In re Za.G.*, 2020-Ohio-405, ¶ 102 (6th Dist.).

**{¶ 55}** Mother contends that the juvenile court's finding under R.C. 2151.414(E)(1) that the children could not be placed with her within a reasonable time is against the manifest weight of the evidence because she substantially complied with her case plan.  In support, Mother asserts that she completed all parts of her case

20.

plan other than to obtain housing, and she only failed to obtain housing because she could not afford to do so.

{¶ 56} However, there was competent, credible evidence to support the juvenile court's finding that Mother "failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren]'s home." Throughout the case's pendency, Mother was in shifting, unstable relationships with different romantic partners, depending on each of them to provide housing for her. Indeed, Mother was homeless when she was between relationships. She also repeatedly saw Father despite telling HCDJFS caseworkers that he was abusive and even after filing charges against him for a domestic violence incident and despite a court order prohibiting him from contacting her. The two other men with whom she lived during this case also had criminal backgrounds, never submitted to a background check, and did not have a residence suitable for children. Mother continued these relationships even after being discharged from mental health counseling.

{¶ 57} Mother claims that independent housing was difficult for her to obtain because of the cost, and despite her continuous employment during the case, she could not afford housing. Notably, during the pendency of this case, Mother lost her job at a convenience store because she was charged with selling alcohol to underaged persons and was employed part-time at a fast-food restaurant after that. Further, Kennard assisted Mother in finding subsidized housing by helping her identify housing providers and submit applications. When an apartment became available, Mother failed the background

21.

check and refused Kennard's assistance in negotiating with the housing provider to get the apartment. Indeed, Dunn later testified that Mother was "pretty resolved to remain in a living situation with" a boyfriend.

{¶ 58} Accordingly, the juvenile court's finding under R.C. 2151.414(E)(1) that mother failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home is not against the manifest weight of the evidence.

## 2. The Children's Best Interest

{¶ 59} Mother also argues that the juvenile court failed to consider the children's best interests. In determining the children's best interests, the juvenile court was required to consider several factors, including the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period …;

22.

(d) The child's need for a legally secure permanent placement and whether

that type of placement can be achieved without a grant of permanent

custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section

apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 60} In this case, Mother argues that by granting permanent custody to HCDJFS, the juvenile court deprived the children "of the opportunity to grow up in the care of their mother, who has demonstrated her love, commitment, and ability to provide for the Child's needs."

{¶ 61} There is, however, competent, credible evidence supporting the juvenile court's best-interests determination. At the time of the permanent custody hearing, the children had been placed outside of the parents' home for nearly two years. According to the HCDJFS caseworkers, the children's guardian ad litem, and the children's foster parents, all three children are making significant progress in their placements, though they still experience aggressive behavior and anxiety surrounding visits with their parents. They are either receiving or are on waitlists for necessary services. They have bonded with their foster families, each of whom has expressed an intention to adopt the children. Further, their foster families have all expressed a willingness to continue the visits between the siblings. Finally, the guardian ad litem testified that the children's needs require separate placements to ensure they each receive individualized attention

23.

and care. Considering this evidence, the juvenile court's finding that permanent custody to HCDJFS is in the children's best interests is not against the manifest weight of the evidence.

{¶ 62} Accordingly, Mother's assignment of error is not well-taken.

**A. Father was not prejudiced by the court's failure to appoint a guardian ad litem.**

{¶ 63} In support of his assignment of error, Father argues that because he appeared to be incompetent during the case, R.C. 2151.281(C) and Juv.R. 4(B)(3) required the juvenile court to appoint a guardian ad litem to protect his interests. Father asserts that the juvenile court's failure to appoint a guardian ad litem for him—despite the fact that father already had a guardian throughout the case—prejudiced him because a guardian ad litem would have "advocated for services to address [Father's] needs, attacked the agency's failure to connect [Father] with the proper services, and argued that [Father's] failure to comply with the case plan was related to his mental incompetency." Father identifies only one specific service that he claims he needed to address his case plan—a service to address his "mental incapacity which prevents him from taking his medication on his own"—though he generally states that he needed other services as well. Father concedes that these services "may not have been something that he wanted, but a guardian ad litem could have argued for these services against [father's] wishes." Finally, Father claims that a guardian ad litem has different duties than a guardian, and therefore the presence of his guardian throughout this case was insufficient to meet the

requirements of R.C. 2151.281(C). Notably, Father admits that there is no evidence in the record that his guardians failed to fulfill any of their duties.

{¶ 64} Because Father failed to raise the issue of a guardian ad litem in the juvenile court, his assignment of error is reviewed for plain-error. *In re N.W.*, 2024-Ohio-2104, ¶ 11 (6th Dist.), citing *In re A.G. and J.G.*, 2004-Ohio-5665, ¶ 6 (6th Dist.). Accordingly, reversal is only permissible if Father demonstrates the juvenile court erred in failing to appoint a guardian ad litem for Father and the error affected the outcome of the proceeding. *In re May.R.*, 2019-Ohio-3601, ¶ 56 (6th Dist.).

{¶ 65} R.C. 2151.281(C) provides as follows:

In any proceeding concerning an alleged or adjudicated delinquent, unruly, abused, neglected, or dependent child in which the parent appears to be mentally incompetent or is under eighteen years of age, the court shall appoint a guardian ad litem to protect the interest of that parent.

Similarly, Juv.R. 4(B) provides in relevant part:

The court shall appoint a guardian ad litem to protect the interests of a child or incompetent adult in a juvenile court proceeding when:

…

(3) The parent is under eighteen years of age or appears to be mentally incompetent[.]

{¶ 66} Notably, the role of a guardian ad litem when it comes to an incompetent parent is more limited than the role of a general guardian, "who has the general care and

25.

control of the ward." *In re A.G. & J.G.* at ¶ 35. For example, "it is not the duty of the guardian ad litem … to prompt his or her ward to take advantage of available services." *Id.*, citing *In re Anderson*, 2002-Ohio-7405, at ¶ 13 (4th Dist.); *see also In re B.E.*, 2014-Ohio-3178, ¶ 23 (4th Dist.).

{¶ 67} Instead, "the purpose of a guardian ad litem is to secure for the incompetent person a proper defense or an adequate protection of his or her rights." *In re King-Bolen*, 2001-Ohio-1412 (9th Dist.), citing *In re Height*, 47 Ohio App.2d 203, 206 (1975). The statute requires that the guardian ad litem "protect the interest of [the] parent," but the guardian ad litem "may believe the [parent's] wishes do not align with [the parent's] best interests" and therefore may not advocate for reunification. *In re K.J.D.*, 2013-Ohio-610, ¶ 51 (10th Dist.); *see also In re B.E.* at ¶ 24 ("Here, it is pure speculation to state that a guardian ad litem appointed for appellant would have recommended that the trial court deny appellee permanent custody.").

{¶ 68} Here, due to his incompetence, Father had been the ward of a guardian well before HCDJFS initiated this case, and he had a guardian throughout this case. Although Frombaugh, Father's initial guardian, did seek to be removed during the pendency of this case, Donnamiller was appointed father's guardian immediately upon Frombaugh's removal, resulting in no interruption. Father cites no case law or other authority to establish that a juvenile court must appoint a guardian ad litem to protect the interests of an incompetent parent who already has a general guardian. As Father concedes, there is no evidence in the record to establish that his guardians did not fulfill their duties.

26.

Indeed, the record demonstrates that his guardians regularly communicated with the court and HCDJFS caseworkers to advocate for Father's interests and appeared at all hearings.

{¶ 69} But even if Father was entitled to a guardian ad litem, he cannot establish the juvenile court's failure to appoint one prejudiced him. Father was connected to multiple mental health service providers offering various types of care, including psychiatric care, mental health counseling, batterer's intervention, and case management services. He was banned from one office after an aggressive outburst, refused to attend another service, and was not compliant with other services. He was hostile and aggressive with his HCDFJS caseworker, who felt unsafe visiting Father in his home, and his first guardian, who sought her removal. He also outright refused to take his medication. Father has not established how the appointment of a guardian ad litem would have somehow made him more amenable to mental health services. *See In re King–Bolen*, 2001-Ohio-1412 (9th Dist.) (holding mother was not prejudiced by the juvenile court's failure to appoint a guardian ad litem when mother failed to establish how a guardian ad litem "would have enabled her to …. cooperate with the service providers"); *see also In re A.G. & J.G.*, 2004-Ohio-5665, ¶ 39 (holding that mother could not establish prejudice when "from the record, it is evident that appointment of a guardian ad litem would not have remedied appellant's failure to comply with her case plan"). Indeed, Father's argument that a guardian ad litem would have advocated for him to undergo services against Father's wishes is purely speculative, and a guardian ad litem

27.

may very well have determined that Father's best interests were served by the juvenile court's judgment in this case.

**{¶ 70}** Accordingly, Father's assignment of error is not well-taken.

## V. Conclusion

**{¶ 71}** For the foregoing reasons, the judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed. Mother and Father are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

_____
JUDGE

Myron C. Duhart, J.

_____

Charles E. Sulek, P.J.                                          JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

28.